UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE KALOBIOS PHARMACEUTICALS, INC. SECURITIES LITIGATION | Case No. 5:15-cv-05841-EJD<br><br>**ORDER GRANTING DEFENDANT MARTIN SHKRELI'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 61 |

Lead Plaintiffs Kaniz Fatema, Zeke Ingram, Bhaskar R. Gudlavenkatasiva, and Abuhena M. Saifulislam, as well as Plaintiff Austin Isensee (collectively the "Plaintiffs"), individually and on behalf of all the other persons similarly situated, bring this putative securities class action against KaloBios Pharmaceuticals, Inc. ("KaloBios") and individuals Ronald Martell, and Herb Cross, and Martin Shkreli, alleging violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Defendants KaloBios, Ronald Martell, and Herb Cross reached a partial settlement with Plaintiffs, which the court granted final approval of concurrently with the entry of this order. Dkt. No. 93. Accordingly, Defendant Shkreli remains the sole non-settling defendant in this case.

Presently before the court is Shkreli's Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and for failure to plead claims with the requisite level of particularity under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. 78u-4 *et seq.* (1995). Def. Shkreli Mot. to Dismiss ("MTD"), Dkt. No. 61. Having carefully considered the papers submitted by both parties in this matter, Shkreli's Motion will be granted for the reasons explained below.

## I. REQUEST FOR JUDICIAL NOTICE

As a preliminary matter, Shkreli requests that the court take judicial notice of certain documents in connection with his Motion to Dismiss. See Dkt. No. 61-3 ("RJN"). Specifically, Shkreli requests judicial notice of Exhibits 1-14 to the Declaration of Peter C. Buckley, filed in support of Shkreli's Motion. Exhs. 1-14, Buckley Decl., Dkt. Nos. 61-1, 61-2. Shkreli's request for judicial notice is unopposed as to Exhibits 1-4 and 7-10, and it is therefore GRANTED. However, Plaintiffs oppose Shkreli's request as to Exhibits 5 and 6, purported transcriptions of interviews quoted in FAC, as well as Exhibits 11-14, four news articles Plaintiffs assert are not cited in the FAC. See Opp. at 16.

When ruling on a motion to dismiss, courts may consider documents incorporated by reference in a complaint or upon which a complaint necessarily relies, as well as matters subject to judicial notice. Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179, (2007)). Federal Rule of Evidence 201 allows a court to take judicial notice of adjudicative facts "not subject to reasonable dispute in that [they are] ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Judicial notice of news articles may be appropriate in securities fraud cases to show "that the market was aware of the information contained in news articles.'" In re Am. Apparel, 855 F. Supp. 2d at 1062 (quoting Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999); see ScripsAmerica, Inc. v. Ironridge Glob. LLC, 119 F. Supp. 3d 1213 (C.D. Cal. 2015) ("Taking judicial notice of news reports and press releases is appropriate to show that the market was aware of the information contained in news articles"); In re Splash Tech. Holdings, Inc. Sec. Litig., No. C 99-00109 SBA, 2000 WL 1727405, at *7, n. 6 (N.D. Cal. Sept. 29, 2000) (holding that because omitted information in the case had been disclosed elsewhere, "the Court may take judicial notice that the market already was aware of the information."); see also Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P., 435 F.3d 396, 401 n. 15 (3d Cir.

2006) ("We see no basis to upset the District Court's decision to take judicial notice of newspaper articles supplied by appellees."). However, judicial notice of news articles is generally "limited to a narrow set of circumstances . . . e.g., in securities cases for the purpose of showing that particular information was available to the stock market." Gerritsen v. Warner Bros. Ent. Inc., 112 F. Supp. 3d 1011, 1028 (C.D. Cal. 2015).

Here, Shkreli requests judicial notice of four news articles regarding his alleged misconduct in connection with his other companies prior to the Class Period. See Exhs. 11-14, Buckley Decl. Specifically, Exhibit 11 is an article published by The New York Times on September 22, 2015 entitled "*Martin Shkreli, the Mercurial Man Behind the Drug Price Increase That Went Viral*;" Exhibit 12 is an article published by FierceBioTech on August 17, 2015 entitled "*Retrophin goes after Shkreli with a $65M suit, claims of flagrant mismanagement*;" Exhibit 13 is an article published by Newsweek on September 13, 2015 entitled "*Federal Prosecutors Target Martin Shkreli in a Criminal Investigation*;" and Exhibit 14 is an article published by Forbes on August 18, 2015 entitled "*Retrophin Sue Founder Martin Shkreli For $65M. His Reply: 'Preposterous.'*" RJN at 2-3.

Shkreli does not offer these news reports for the truth of their content, but rather to refute Plaintiffs' "fraud-on-the-market" theory by demonstrating that public news sources had "already widely disseminated the alleged omissions to the investing public" at the time of his arrest and public release of the indictments on December 17, 2015. Id. at 3. Because Shkreli's request is for the purposes of showing "that the market was [already] aware of the information contained in news articles," it therefore fits the "narrow set of circumstances" in securities litigation where judicial notice of newspaper articles is appropriate. See Gerritsen, 112 F. Supp. 3d at 1028; Heliotrope, 189 F.3d at 981, 975-76 (explaining that where the market has already been made aware of the purportedly concealed information "the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled."); Benak, 435 F.3d at 401 n. 15 (affirming district court's decision to take judicial notice of news articles, explaining "[w]hether appellants read the articles or were aware of them is immaterial" because

3
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

the articles "serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."); In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F.Supp.2d 416, 425 n. 15 (S.D.N.Y.2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment.").

Moreover, unlike in cases such as Gerritsen, where the court declined to take judicial notice of articles published by third party sources like Wikipedia and Answers.com based in part on the fact that such sources are not reliable, there can be little dispute as to the authenticity of the articles here, which include publications by credible and mainstream sources like The New York Times, Forbes and Newsweek. Accordingly, the court GRANTS Shkreli's request for judicial notice as to Exhibits 11-14. As to Exhibits 5 and 6, Shkreli's request for judicial notice is DENIED because the court did not rely on these exhibits in reaching this decision.

## II. BACKGROUND

KaloBios is a biopharmaceutical company founded in 2000 and headquartered in South San Francisco, California. FAC ¶ 4. KaloBios's stock traded on the NASDAQ under the ticker symbol "KBIO." Id. Martin Shkreli served as the Chief Executive Officer ("CEO") and Chairman of KaloBios during the Class Period. Id. ¶ 29, 54. Prior to the Class Period, Shkreli was a hedge fund manager and pharmaceutical investor who co-founded the investment company MSMB in September 2009 and the biopharmaceutical company Retrophin in 2011.[1] Id. ¶ 5. Shkreli served as a managing partner of MSMB Capital until it ceased to operate in 2013, and CEO of Retrophin from December 17, 2012 until October 13, 2014. Id. ¶¶ 62(a), 63.

Beginning in early January 2015, prior to the Class Period, KaloBios was under "severe financial distress," and by mid-2015, the company's leadership began searching for other potential

---

[1] Pursuant to Plaintiffs' FAC, "MSMB" refers to an umbrella of affiliated investment companies co-founded by Defendant Shkreli and Marek Biestek, including MSMB Capital LLC, MSMB Capital Management LLC, and MSMB Healthcare Management LLC. "Retrophin" refers to affiliated drug companies founded by Defendant Shkreli, including Retrophin, Inc. and Retrophin LLC. See FAC at 4, n. 1. The court adopts these definitions for the purposes of this Motion.

4
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

investors. Id. ¶¶ 43-44.  On November 5, 2015, KaloBios announced "a 61% workforce reduction and the pursuit of 'strategic alternatives,'" including the potential sale of the company or its assets, a corporate acquisition, further restricting its activities, winding down operations, and/or bankruptcy proceedings. Id. ¶¶ 46-47.  By November 9, 2015, KaloBios announced it was halting enrollment in its clinical studies, and on November 13, 2015, KaloBios issued a press release stating that its limited cash resources precluded continued investigation of strategic alternatives, and as a result, it would begin efforts to "wind down its operations" and liquidate its assets. Id. ¶¶ 47, 48.  As a result of this news, KaloBios's stock further declined, closing at $0.90 on November 13, 2015. Id. ¶ 49.

Between November 10, 2015 and November 24, 2015, Shkreli purchased 2,075,200 shares of KaloBios common stock on "the open market," making him the largest shareholder of KaloBios, and prompting discussions with KaloBios' "regarding possible direction for the company to continue in operation." Id. ¶¶ 6, 50.  Just prior to the Shkreli's purchase of the majority shares of KaloBios stock, between August and September 2015, reports of criminal investigations into Shkreli's management of Retrophin and MSMB Capital were published by mainstream news sources including The New York Times, Forbes and Newsweek. Buckley Decl., Exhs. 11-14, Dkt. No. 61-2.  For example, an article published by Newsweek on September 13, 2015 entitled "*Federal Prosecutors Target Martin Shkreli in a Criminal Investigation*;" stated that Shkreli was under investigation for allegations of "insider trading, disguising the purpose of corporate payments for his benefit, defrauding shareholders by snatching business opportunities for himself, destruction of evidence, failure to disclose material facts to shareholders and other potential crimes." Id., Exh. 13.  Nevertheless, by November 19, 2105, KaloBios' Board had accepted Shkreli's financing proposal and appointed him as CEO.  FAC ¶¶ 50-54.  The existing Board then resigned. See id. ¶ 62(b).

After Shkreli was appointed as CEO, he made a number of public statements regarding KaloBios' strong potential and positive progress, as well statements regarding his efforts to turn the company around financially and why he was qualified to be the CEO. See id. ¶¶ 54, 57, 60,

5
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

62, 65, 68, 70, 73, 75, 78. Plaintiffs allege that these statements led to a recovery and rise in KaloBios stock price. Id. However, on December 17, 2015, Shkreli was arrested for alleged misconduct at his previous company, Retrophin, the details of which were outlined in a 30-page federal indictment and a 22-page SEC Complaint made public the same day. Id. ¶¶ 15, 81-82. Shkreli was immediately terminated as CEO. Id. ¶ 81. When the news of Shkreli's arrest broke, KaloBios stock price fell dramatically, "plummet[ing] 53% in pre-open trading before NASDAQ halted all trading so it could request more information from KaloBios." Id. ¶ 16. Soon thereafter on December 24, 2015, NASDAQ announced that KaloBios's stock would be delisted, and on December 29, 2016 KaloBios filed for Chapter 11 bankruptcy. Id. ¶¶ 16, 88-89. When trading resumed on January 13, 2016, KaloBios stock "opened at $2.51, reached an intra-day low of $1.02, and finally closed at $4.39." Id. ¶ 90. This lawsuit followed.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008); Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

At the motion to dismiss stage, the court must read and construe the complaint in the light most favorable to the non-moving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The court must accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. "In all cases, evaluating a

6
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

complaint's plausibility is a context-specific endeavor that requires courts to draw on ... judicial experience and common sense." Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Claims that sound in fraud are subject to a heightened pleading standard. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) ("Rule 9(b) imposes heightened pleading requirements where the object of the conspiracy is fraudulent"). The allegations must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged. Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). To that end, the allegations must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz, 476 F.3d at 764l; see Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003) (citation omitted) (explaining that averments of fraud must be accompanied by the "who, what, when, where, and how" of the misconduct charged). In the context of a securities litigation case, Rule 9(b) requires the particular circumstances indicating falseness of the defendant's statements to be pled, specifically, "an explanation as to why the statement or omission complained of was false or misleading." See In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (superseded by statute on other grounds). In other words, fraud or claims asserting fraudulent conduct must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). In the event that a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the

7

Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv–Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)).

**IV. DISCUSSION**

This is a federal securities class action brought by certain purchasers of KaloBios common stock between the Class Period of November 19, 2015 and December 16, 2015 (the Class Period). FAC ¶ 2. Plaintiffs allege that because of Shkreli's "prior improprieties, frauds, and illegal and criminal misconduct," the public statements he made touting his leadership and the positive prospects for KaloBios were materially false and misleading. See id. ¶¶ 55, 58, 61, 63, 66, 69, 71, 74, 76, 79. They further allege that Shkreli had an obligation to disclose his alleged misconduct in connection with Retrophin and MSMB Capital to shareholders when he made these statements about KaloBios. Plaintiffs contend that as a result of Shkreli's statements, as well as his failure to disclose the allegations of misconduct against him, "KaloBios securities traded at inflated prices during the Class Period." Id. ¶¶ 17, 91. However, Plaintiffs assert that once the "truth" about Shkreli's fraudulent conduct was "revealed" to the public at the time of Shkreli's arrest, KaloBios's stock "suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and other Class members." Id.

These allegations fall into two general categories: (1) "reputation and qualification" allegations, asserting that Shkreli mislead investors regarding his reputation and qualifications to lead KaloBios by failing to disclose his alleged misconduct at Retrophin and MSMB, and through affirmative misstatements about his business experience, credibility, and trustworthiness; and (2) "KaloBios recovery and success" allegations, asserting that Shkreli misled investors through unrealistic statements touting KaloBios' financial recovery, advancement potential and operational successes. See FAC ¶¶15, 54-55, 57-58, 60-66, 68-69, 70-71, 74-76, 79, 82, 84.

To bring a private securities fraud action under Section 10(b) and Rule 10b–5, a plaintiff must establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

8
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

Lloyd v. CVB Financial Corp., 811 F.3d 1200, 1206 (9th Cir. 2016) (citations omitted). Shkreli moves to dismiss on the grounds that Plaintiffs fail to plead facts sufficient to establish a material misrepresentation or omission (falsity), or reliance.

### A. Statements and Omissions Regarding Shkreli's "Reputation and Qualification"

First, Shkreli argues that Plaintiffs' claims arising from the "reputation and qualification" statements and omissions should be dismissed because they fail to satisfy the element of reliance.

To plead reliance in a securities fraud case, a class action plaintiff may rely on the "fraud-on-the-market presumption" set forth in Basic v. Levinson, 485 U.S. 224 (1988). This theory is based on the assumption that "[t]he price of a stock traded in an efficient market fully reflects all publicly available information about the company and its business." Connecticut Ret. Plans & Trust Funds v. Amgen, Inc., 660 F.3d 1170, 1173 (9th Cir. 2011) (citing Basic, 485 U.S. at 241-242). Assuming this premise, any purchaser of stock at the prevailing market prices is therefore "presumed to have relied on that price – and, by extension, each piece of publicly available information it reflects – as a measure of the stock's value, even if the [purchaser] never saw that information." Id. (citing Basic, 485 U.S. at 247). Unlike pleading actual reliance, "[i]n a fraud on the market case, the plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information." In re Apple Computer Sec. Litig., 886 F.2d 1109, 1114 (9th Cir. 1989).

However, because this presumption is based on the theory that the market was deceived by a defendant's misleading statements or omissions, the presumption may be rebutted where a defendant can show that the truth had actually been made available to the market through a different source. See Provenz v. Miller, 102 F.3d 1478, 1492 (9th Cir. 1996) ("In a 'fraud on the market' case an omission is materially misleading only if the information has not already entered the market."); In re Convergent Techs. Sec. Litig., 948 F.2d 507, 513 (9th Cir. 1991) ("[A]n omission is materially misleading only if the information has not already entered the market. If the market has become aware of the allegedly concealed information, the facts allegedly omitted by

the defendant would already be reflected in the stock's price and the market will not be misled.") (internal quotations omitted). This principle is often referred to as the "truth-on-the-market" doctrine. Provenz, 102 F.3d at 1493. However, a defendant seeking to invoke the "truth-on-the-market" doctrine to rebut a "fraud-on-the-market" presumption in a securities fraud case must satisfy a heavy burden of proof. Id. Specifically, the Ninth Circuit has instructed that the "truth-on-the-market" doctrine requires the defendant to "prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insider's one-sided representations.'" Id. at 1492-93 (quoting In re Apple, 886 F.2d at 1116).

Here, Shkreli acknowledges the high standard of proof required to show "truth-on-the-market," but contends that the significant media coverage of his alleged misconduct meets that standard here. Shkreli argues that because information about his dubious reputation was already well-documented in the press, and was therefore publicly available to the market prior to and during the Class Period, Plaintiffs are not entitled to a presumption of reliance under the "fraud-on-the-market" theory. The court agrees.

As discussed above, the court has taken judicial notice of four news articles in support of Shkreli's argument that information about the misconduct he ostensibly concealed or misrepresented was already publically available to the market at the time of his arrest on December 17, 2015. *Supra*; see Exhs. 11-14, Buckley Decl. These articles cover Shkreli's public termination from Retrophin and its subsequent lawsuit against him, identify a multitude of personal and professional accusations of misconduct, and confirm the existence of an ongoing criminal investigation into his actions, among other things. Id. For example, on September 22, 2015, The New York Times published the article "*Martin Shkreli, the Mercurial Man Behind the Drug Price Increase That Went Viral*," which reported the following:

> The board of Retrophin fired Mr. Shkreli a year ago. In August Retrophin filed a federal lawsuit in New York accusing its former chief executive of breaching his duty of loyalty to the company. It accused Mr. Shkreli of arranging to pay off some angry investors in his hedge fund by having Retrophin enter into consulting

10
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

agreements with them.

Exh. 11, Buckley Decl. The article also included information that "[a] former portfolio manager at MSMB … said in an affidavit early last year that he and his family were repeatedly harassed on social media by Mr. Shkreli in 2013." Id.

Prior to that, on August 17, 2015, a news publication covering the biotech industry called FierceBioTech published the article "*Retrophin goes after Shkreli with a $65M suit, claims of flagrant mismanagement*." Exh. 12, Buckley Decl. This article reported that Retrophin fired Shkreli and was now suing him for more than $65 million, alleging he mismanaged the company's funds, "us[ing] a series of self deals, falsified documents and extralegal maneuvers to transform Retrophin into a personal bank that could clear his firm's debts and line his pockets." Id. A day later on August 18, 2015, Forbes also published an article entitled "*Retrophin Sues Founder Martin Shkreli For $65M. His Reply: 'Preposterous*,'" reporting similar information. Exh. 14, Buckley Decl.

And perhaps most pertinently, on September 13, 2015, Newsweek published its article, "*Federal Prosecutors Target Martin Shkreli in a Criminal Investigation.*" Exh. 13, Buckley Decl. The Newsweek article contained extensive discussion of the criminal investigation into Shkreli, which it stated had been underway since at least January. Id. Newsweek wrote that "[t]he criminal investigation involves Retrophin, a public company where Shkreli served as an officer, director, and 10 percent owner of the outstanding stock before being ousted amid multiple allegations of misconduct." Id. The article goes on to detail many of the specific allegations against Shkreli, writing:

> The inquiry, according to court records and people with knowledge of the inquiry, involves such a vast number of suspected crimes it is difficult to know where to start. A quick summary of the government's theory: If there was money, Shkreli took it. If there were facts to be revealed, Shkreli hid them. If there were securities laws, Shkreli broke them.
> …
> According to the court records and people with knowledge of the case, the allegations against Shkreli that are under investigation involve insider trading, disguising the purpose of corporate payments for his benefit, defrauding shareholders by snatching

11
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

<blockquote>
business opportunities for himself, destruction of evidence, failure to disclose material facts to shareholders and other potential crimes.
</blockquote>

Id. Newsweek even included that after being notified of the investigation, Shkreli "invoked his Fifth Amendment right against self-incrimination because of the criminal case whenever his testimony has been sought in the many civil lawsuits filed against him about his business dealings." Id.

Based on the content of these articles, as well as the credibility and wide circulation of their respective sources, the court agrees that the market was aware of the information Plaintiffs accuse Shkreli of misrepresenting or failing to disclose. Any undisclosed information that might have otherwise misled the market about Shkreli's reputation would not have done so here because such information had already been substantively disseminated by the press. As to Shkreli's proactive statements referencing his trustworthiness, or touting his prior business ventures as "attributes" and "indicators of his professional competence," Plaintiffs argue that the "facts and circumstances" of Shkreli's alleged misconduct while at MSMB and Retrophin "made clear that he and his cronies … had been utterly unfit to run KaloBios," and therefore these statements were "materially false and misleading when made." Opp. at 12-13. Assuming that these statements could be considered materially false and misleading, the market here would not have been misled because the "truth"- or less positive considerations - regarding Shkreli's reputation and prior business dealings was already in the public domain. While Plaintiffs assert that the "facts and circumstances" of Shkreli's misconduct were first revealed to investors on December 17, 2015, the articles published by the New York Times, Newsweek, FierceBioTech, and Forbes show otherwise. See Exhs. 11-14, Buckley Decl.

In response, Plaintiffs argue that even if the articles exposed some of the relevant information regarding Shkreli's misconduct, the indictment and SEC Complaint that were made public at the time of his arrest "set forth ***extensive, previously undisclosed*** details as to MSMB and Retrophin misconduct not discussed in the articles Shkreli cites… such as fraudulent schemes with outside legal counsel….'" Opp. at 19 (emphasis in original). Plaintiffs conclude that the articles therefore could not have conveyed the misconduct to investors with the "degree of

12
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

intensity and credibility sufficient to effectively counterbalance any misleading impression" created by his representations. Id. (citing In re Apple, 886 F.2d at 1116 and Provenz, 102 F.3d at 1492-1493). The court again disagrees. To the extent that Shkreli's own public statements conjured a misleading impression of his reputation and qualifications for managing KaloBios, that impression would have been offset by the highly public allegations of fraud, insider trading, and self-dealing, among others, that are now tied to Shkreli's public image. See e.g. Exh. 13, Buckley Decl. The fact that certain specific details of Shkreli's alleged misconduct were not included in the articles does not mean the articles were insufficient to convey the relevant information to the market. To the contrary, the accusations included in the articles are largely consistent with the "previously undisclosed" details identified in Plaintiffs' Opposition brief. And, even more relevantly, they are consistent with the information Plaintiffs argue was misrepresented and omitted during the Class Period – namely, that Shkreli had been involved in various fraudulent schemes at MSMB and Retrophin that would make him unfit to be CEO of KaloBios.

Plaintiffs argue that "Shkreli's Motion also ignores the important distinction between an *investigation*, a fact referenced in the four articles he cites, versus a filed SEC complaint, filed indictments, an ***arrest***, and termination as KaloBios CEO, which together served as the alleged corrective event on December 17, 2015." Opp. at 20 (emphasis in original). However, this distinction is largely irrelevant to the question of whether Shkreli misrepresented or omitted material facts *prior* to that date. The statements and omissions at issue here would have occurred prior to Shkreli's indictment, arrest, and termination. As a result, to the extent that Shkreli had a duty to disclose the allegations of misconduct against him, the obligation would be to disclose the substance of the underlying misconduct allegations, not speculate as to the future consequences of such allegations. Because the criminal investigation, the indictment, and the arrest all arose from substantively the same allegations of misconduct against Shkreli, Plaintiffs' attempt to distinguish between the market's awareness the investigation versus its lack of awareness that the investigation would subsequently result in an indictment and arrest is unpersuasive.

While it is certainly true that KaloBios stock price suffered a dramatic hit as a result of

13
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

Shkreli's arrest, this is not itself evidence of fraud. A company's stock price is almost certainly going to decline upon news that its CEO was arrested, regardless of whether the CEO had fraudulently misled the market. Plaintiffs' theory appears to be that Shkreli's arrest and the public release of the allegations contained in the indictment somehow revealed to the market the truth about Shkreli's lack of fitness to be CEO of KaloBios. However, Shkreli's reputation – positive and negative – was already widely known prior to his arrest. In other words, Shkreli's arrest did not disclose or correct material information about him or his reputation that was not previously available to investors, other than the fact that he was actually arrested.

Finally, Plaintiffs argue that, notwithstanding the civil and criminal misconduct allegations discussed by the articles, "those very same articles include [Shkreli's] strong denials of wrongdoing and his threats to counter-sue," and thus are insufficient to rebut the "fraud on the market" presumption. Opp. at 18. Plaintiffs cite Berry v. Valence Tech., Inc., where the court identified a CEO's public response refuting the at-issue allegations as a relevant consideration in finding that there was no inquiry notice. 175 F.3d 699, 706 (9th Cir. 1999). However, the court also explained that absent more, a response or public denial "is insufficient to dissipate 'storm clouds' over a company once they have gathered." Id. Moreover, the article at issue in Berry was distinguishable from those at issue here. There, the Ninth Circuit noted that the article "made no allegation of actual fraud on the part of [the defendant] or its principals," and explained that "[a] press article's general skepticism about a company's future prospects is not sufficient to excite inquiry into the specific possibility of fraud." Id. at 705. In contrast, the articles offered here include more than "general skepticism," and contain specific references to the criminal investigation into Shkreli and the various allegations against him. Indeed, the public scrutiny of Shkreli was so significant during this time that it is highly improbable Shkreli's denials of wrongdoing would "dissipate the storm clouds" that had gathered around him.

In light of the significant publicity garnered by the criminal investigation and related accusations of misconduct *prior to* Shkreli's arrest on December 17, 2015, the court agrees that the market was aware of the information Plaintiffs accuse Shkreli of withholding or

14
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

misrepresenting before any "corrective disclosure" occurred. Consequently, while a "truth-on-the-market" defense is a heavy burden at this stage of proceedings, the court finds that Shkreli has met that burden and rebutted the fraud-on-the-market presumption relied on by Plaintiffs here. Heliotrope, 189 F.3d at 981, 975-76 (explaining that in a "fraud on the market" case "[i]f the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's prices" and reliance will not be satisfied); In re Apple, 886 F.2d at 1115 ("[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources."). Absent this presumption, Plaintiffs fail to adequately plead reliance. Shkreli's Motion to Dismiss will therefore be GRANTED as to claims based on the alleged "reputation and qualification" statements or omissions.

Because Plaintiffs fail to satisfy the element of reliance, the court need not reach the question whether Shkreli actually had an obligation to disclose allegations of misconduct unrelated to KaloBios to the KaloBios shareholders. It merits noting that courts have been skeptical toward theories of liability based on broad duties to disclose allegations of misconduct, especially when the connection between the liability sought and the alleged misconduct is attenuated. See e.g., Retail Wholesale & Dep't Store Union Local 338Retirement Fund v. Hewlett-Packard Co., 52 F. Supp. 3d 961, 971 (N.D. Cal. 2014), aff'd sub nom. Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268 (9th Cir. 2017) ("Plaintiff's theory of liability appears to be that a corporation or senior executive is liable whenever that executive is involved in misconduct that might lead to his or her resignation or termination, regardless of the nature of that misconduct, unless the conduct is disclosed. But that is not the law. …For an omission to be actionable, there must be a duty to disclose the underlying noncompliance or misconduct."); see also In re ITT Educ. Servs. Sec. & Derivative Litig., 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (holding that "securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."); Greenstone v. Cambex Corp., 777 F. Supp. 88, 90-91 (D.Mass. 1991), aff'd, 975 F.2d 22 (1st Cir. 1992) (explaining that

15
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

because "defendants had no duty to disclose information about their illegal business practices," they therefore "cannot be liable under Rule 10b-5"). However, the court declines to address this question at this time.

### B. Statements Regarding KaloBios' Financial Recovery and Promising Business Potential

The second category of statements Plaintiffs identify as false and misleading concern more specific representations regarding KaloBios' financial recovery, advancement potential and operational successes. See FAC ¶¶15, 55, 58. 61, 63, 66, 69, 71, 74, 76, 79, 82, 84. This includes statements like Shkreli's comment that he will "give" KaloBios $100 million of funding necessary to advance its drug trials (¶¶ 11, 68(e)), his stated belief that "I think we will grow KBIO into a large company" (¶57), and press releases or interviews highlighting the "very promising" potential of its primary drug candidate, lenzilumab (¶¶11, 54(a), 60, 68(a)). Plaintiffs contend that these representations were so unrealistic in light of Shkreli's prior misconduct that they amount to being knowingly false and misleading.

While these more specific statements do offer, in the court's view, a potentially stronger basis for allegations that the market could have been misled by Shkreli, Plaintiffs do not actually allege why these statements were false, or plead specific facts that would suggest why an optimistic view of the company was patently misleading or disingenuous. For instance, with respect to Shkreli's remark that he will "give" KaloBios $100 million of funding in order to advance its drug trials, Plaintiffs do not allege that, at the time he made the comment, Shkreli could not follow through on this commitment. Similarly, Plaintiffs do not claim that lenzilumab was *not* a "promising" drug or that its trial would not have proceeded as planned, had Shkreli not been arrested. The fact that Shkreli's arrest prevented such plans from being realized does not render public statements about them fraudulent if they were reasonable when made. Plaintiffs' argument that the plans were "unrealistic" is too speculative and vague to satisfy the pleading standard. While Plaintiffs may be correct that the long-term success of KaloBios was unrealistic, the reality is that Shkreli was arrested before proof of this theory had an opportunity to come to

16
Case No.: 5:15-cv-05841-EJD
ORDER GRANTING MOTION TO DISMISS OF DEFENDANT MARTIN SHKRELI

light. Accordingly, the court concludes that Plaintiffs have failed allege a sufficient factual basis for their allegations that the "KaloBios recovery and success" statements were false or misleading. Accordingly, Shkreli's Motion to Dismiss will be GRANTED with respect to claims these statements as well.

## V. ORDER

For the foregoing reasons, Shkreli's Motion to Dismiss (Dkt. No 61) is GRANTED. All claims are DISMISSED WITH LEAVE TO AMEND. Any amended complaint must be filed on or before **July 21, 2017**.

**IT IS SO ORDERED.**

Dated: June 23, 2017

EDWARD J. DAVILA
United States District Judge