Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6449
E-mail:  jpafiti@pomlaw.com

Marc I. Gross
Jeremy A. Lieberman
Matthew L. Tuccillo
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:     (212) 661-1100
Facsimile:     (212) 661-8665
Email: migross@pomlaw.com
        jalieberman@pomlaw.com
        mltuccillo@pomlaw.com

(*additional counsel on signature page*)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| **IN RE KALOBIOS PHARMACEUTICALS, INC. SECURITIES LITIGATION** | Case No. 15-cv-05841-EJD |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| | <u>DEMAND FOR JURY TRIAL</u> |

**INTRODUCTION**

1.      Lead Plaintiffs Kaniz Fatema, Zeke Ingram, Bhaskar R. Gudlavenkatasiva, and Abuhena M. Saifulislam (the "KaloBios Investor Group"), together with Plaintiff Austin Isensee (altogether, the "Plaintiffs"), individually and on behalf of all the other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the ongoing investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, press releases, transcripts of earnings calls, and other public statements by KaloBios Pharmaceuticals, Inc. ("KaloBios") and the other Defendants; extensive interviews with numerous confidential witnesses; review of the Securities and Exchange Commission ("SEC") complaint and the criminal indictments against Defendant Shkreli; review of transcripts of testimony given and arguments made at Defendant Shkreli's criminal trial; review of press coverage regarding Defendant Shkreli's criminal trial and conviction; and review and analysis of other publicly available information, including pertinent press coverage and analyst reports.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

2.      As against Defendant Martin Shkreli, this is a federal securities class action on behalf of a class (the "Class") consisting of all persons or entities who purchased or otherwise acquired the common stock of KaloBios between November 19, 2015 and December 16, 2015 (the "Class Period"), both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants, their immediate family members, and KaloBios's officers, directors, executive employees, subsidiaries and affiliates.

3.    The facts and circumstances alleged herein also gave rise to claims against Settling Defendants Ronald Martell ("Martell"), Herb Cross ("Cross"), and KaloBios (the "Settling Defendants") on behalf of investors who purchased or otherwise acquired the common stock of KaloBios between November 18, 2015 and December 16, 2015, inclusive, for violations of Exchange Act §§10(b) and 20(a).   Those claims were resolved by a partial settlement (the "Partial Settlement"), with respect to which the Court has granted final approval.   The Partial Settlement of the litigation as against the Settling Defendants does not affect the remaining claims against Defendant Shkreli as asserted herein.

## OVERVIEW

4.    KaloBios, a biopharmaceutical company, was founded in 2000 and was headquartered in South San Francisco, California.   During the Class Period, KaloBios's stock traded on the NASDAQ under the ticker symbol "KBIO."   Pre-Class Period, its drug candidates in clinical trials included KB003, intended to treat asthma patients, and KB004, intended to treat patients with hematologic malignancies.   Just before the Class Period, KaloBios was under severe financial distress.   It announced a 61% workforce reduction and the pursuit of "strategic alternatives" on November 5, 2015.   By November 13, 2015, it announced that its limited cash resources precluded continued investigation of strategic alternatives, such that it would "wind down its operations."   On this news, KaloBios's stock closed at $0.90 on November 13, 2015.

5.    Defendant Shkreli was a hedge fund manager and pharmaceutical company investor who co-founded investment company MSMB in September 2009 and drug company

Retrophin in 2011.[1]  Between September 2009 and September 2014, he engaged in extensive fraudulent and illegal misconduct at these companies by, *inter alia*, _stealing_ hundreds of thousands of dollars from MSMB; _fraudulently inducing investments_ in MSMB by deceiving investors as to its insufficient liquidity and as to his own abysmal track record as a hedge fund manager; _lying to large investors_ in stating MSMB's assets under management as $35 million when they were only $700 and by identifying as MSMB's independent auditor and administrator firms that had never been hired; _deceiving MSMB's broker_ by misrepresenting that he had located shares sufficient to cover a failed short sale, when he had not done so, leading to the broker closing at a loss of $7 million; _working with his lawyer (who was later indicted) to defraud Retrophin_ into settling MSMB debts and personal debts, including through use of MSMB settlement agreements disguised as sham Retrophin consulting agreements; _working with his lawyer and corrupt employees to fabricate investments_ by MSMB in Retrophin through concealed stock transfers and backdated agreements; and _working with his lawyer to hide settlements with defrauded MSMB and Elea Capital investors_ as sham consulting agreements with Retrophin, for which Retrophin paid consideration but received no services.

6.     The pertinent aspects of this misconduct was, at all relevant times, concealed from investors and the markets.  Specifically:

(a) Investors lacked any real visibility into Defendant Shkreli's personal financial resources and his ability (or lack thereof) to fund any business ventures.  Indeed, his public statements and actions falsely conveyed a greater personal wealth and liquidity than he actually

---

[1]  As used herein, "MSMB" refers to an umbrella of affiliated investment companies co-founded by Defendant Shkreli and Marek Biestek, including MSMB Capital LLC, MSMB Capital Management LLC, and MSMB Healthcare Management LLC.  As used herein, "Retrophin" refers to affiliated drug companies founded by Defendant Shkreli, including Retrophin, Inc. and Retrophin LLC.

possessed, both before and during the Class Period.  Yet, the testimony given at his trial and the degree to which Shkreli had to resort to one fraud upon another to pay off liabilities, evidence that his lacked the resources necessary to stave off KaloBios's bankruptcy and fund its operations, including necessary clinical trials for its drug candidates.

(b) Investors were in the dark as to the criminal participation of Defendant Shkreli's lawyer, Evan Greebel of law firm Kaye Scholer, in the MSMB and Retrophin frauds, for which he was also later arrested, post-Class Period, and now faces his own criminal trial.  Significantly, Kaye Scholer served as outside legal counsel to KaloBios during the Class Period and was listed as its "Company Counsel" in the private placement transaction announced and closed during the Class Period (sometimes referred to as the "PIPES" placement or transaction), which defrauded the PIPES investors out of $8.2 million the day before Shkreli was arrested.

(c) Investors also had no idea that corrupt employees of MSMB and Retrophin co-conspired with Defendant Shkreli, participating in and facilitating the frauds at those companies, nor did they have any idea as to the specific identities of those employees, which was not publicly reported, even in the indictments filed against Shkreli after the Class Period.  Investors likewise did not know that Defendant Shkreli appointed those same co-conspirators to high-level positions at KaloBios during the Class Period, concealing their MSMB and Retrophin misdeeds while touting their business acumen and qualifications.

(d) Last, investors did not know the extent of Defendant Shkreli's criminal misconduct at MSMB and Retrophin.  During the Class Period, Defendant Shkreli vehemently denied any wrongdoing and had countersued Retrophin, seeking $70 million for, among other things, damage to his image as a businessman.  His arrest, and the accompanying indictment and SEC complaint, first revealed both the gravity of his misconduct and quality of the evidence against

him, dispelling the notion that he was the one who had been aggrieved.  The mountain of evidence against him was on full display during his criminal trial, which resulted in his conviction, for which he now faces up to 20 years in prison.

7.     Yet, on November 18, 2015, the day before the start of the Class Period as against Defendant Shkreli, KaloBios issued a press release listing Settling Defendant Cross (its then-CFO) as the company contact (the "11/18/2015 Press Release") stating, *inter alia*, that it "has been informed that an investor group comprised of Martin Shkreli and associates together have acquired more than 50% of the outstanding shares of KaloBios, and that the company is in discussions with Mr. Shkreli regarding possible direction for the company to continue in operation."  It also quoted Settling Defendant Martell (its then-Executive Chairman), as stating, "We have received communications from Mr. Shkreli informing us of his group's ownership position, and a proposal to continue the company's operations.  Our board of directors is prepared to entertain any constructive proposal, which we will act upon promptly."

8.     By that point, Defendant Shkreli had gained effective control over KaloBios due to his majority ownership and his having orchestrated the company's rejection of an alternative funding proposal in favor of his completely assuming the helm as CEO and Chairman.  The specifics of Shkreli's proposal for running KaloBios were closely guarded and knowledge thereof restricted to the highest levels of KaloBios.  Shkreli and his investor group (the "Shkreli Group") had acquired its controlling stake, which was over 50.1% on November 17, 2015 and swelled to 70.0% by November 23, 2015, for an average per-share price of just $1.51. Specifically, a Form 8-K filed on November 23, 2015 later disclosed that, by that date, Shkreli's group had purchased 2,885,000 shares of KaloBios for just $4,363,853.00, and Form 13D filed on November 25, 2015 later disclosed that Shkreli himself controlled 72% of that majority-

6

ownership stake.  Defendant Shkreli was highly motivated to commit the fraud alleged herein, *inter alia*, to drive up the value of this newly-acquired majority stake through his false and misleading statements during the Class Period.

9.     The Class Period as against Defendant Shkreli began on November 19, 2015, when Shkreli, speaking in either his own voice or that of KaloBios, which at that point he fully controlled, made a series of materially false and misleading misstatements and omissions that artificially inflated KaloBios's stock price, beginning with KaloBios's November 19, 2015 press release announcing his appointment as CEO, on which he is listed as the company contact ("11/19/2015 Press Release") and which was later filed with the SEC as an exhibit to a Form 8-K signed by Defendant Shkreli and filed with the SEC on November 23, 2015 (the "11/23/2015 8-K").  These misstatements and omissions fell into four general groups.

10.    First, Shkreli made materially false and misleading misstatements and omissions regarding his ability to deliver necessary funding and financing to KaloBios, which ostensibly would have permitted KaloBios to shepherd lenzilumab through clinical trials and potential FDA approval, to the marketplace.  For instance, the 11/19/2015 Press Release stated, "***We believe that [ ] KaloBios's lenzilumab is a very promising candidate***," "***KaloBios has received a commitment from Mr. Shkreli and other investors for an equity investment of at least $3.0 million***," and "***Mr. Shkreli and the group of investors have committed to a $10 million equity financing facility***."[2]  In a November 25, 2015 interview with Bloomberg (the "11/25/2015 Bloomberg Interview"), Shkreli said, "***KaloBios needs another $100 million <u>that I'm going to give to it</u> so that we can develop lenzilumab***," "***we came in with fresh capital and fresh ideas***

---

[2] All bolded, italicized and/or underlined text herein, if used within a quotation, indicates emphasis added unless otherwise noted.

*and said we underwrite this; we support this*," and "*now the company has the cash to do this clinical trial*."  In slides accompanying a December 3, 2015 conference call (the "12/3/2015 Slides"), filed with the SEC in a Form 8-K signed by Shkreli (the "12/4/2015 8-K"), KaloBios touted that "*The Shkreli Group has acquired a controlling stake of KaloBios*," which ostensibly meant "*Permanent access to capital*."  Yet, unbeknownst to investors, Shkreli did not have sufficient resources to deliver the promised funding, without which lenzilumab lacked any chance, given that KaloBios had already tried and failed to attract pharmaceutical companies to invest particular KaloBios drug candidates like lenzilumab or to partner with KaloBios in the development process.

11.    Second, in a December 3, 2015 Form 8-K filed with the SEC and signed by Defendant Shkreli (the "12/3/2015 8-K"), KaloBios announced the purported raising of millions of dollars in funding through the PIPES transaction.  The 12/3/2015 8-K attached, among other things, the Securities Purchase Agreement for the PIPES transaction, which listed Evan Greebel's law firm, *Kaye Scholer*, as KaloBios's "Company Counsel" for the PIPES transaction and which stated, "*There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission of the Company or any current or former director or officer of the Company.*"  This statement misled investors to believing that there was no longer any pending investigation by the SEC against Shkreli, a statement to which it lent credibility by specifically listing as Kaye Scholer, a nearly 100 year-old, international law firm with hundreds of attorneys and a strong reputation, as KaloBios's "Company Counsel" for the PIPES transaction.  Unbeknownst to investors, however, both Shkreli *and his lawyer at Kaye Scholer* were not only under investigation, but on the cusp of indictment and arrest, and the PIPES transaction was simply another angle of Shkreli's fraud at KaloBios.

12.    Third, Shkreli made materially false and misleading misstatements and omissions regarding the qualifications and abilities of the people he appointed to high-level positions at KaloBios, whose ranks, unbeknownst to Plaintiffs and the Class members, included his unnamed co-conspirators in the MSMB/Retrophin fraud.   For instance, KaloBios's 11/23/2015 8-K announced not only Shkreli's appointment as CEO, but also the appointment of Marek Biestek, Thomas Fernandez, and Michael Harrison to KaloBios's Board, with Fernandez and Harrison joining its Audit Committee and Harrison serving as its Chair, before conveying that KaloBios's exiting Board agreed with this leadership structure by stating, "***The Resigning Directors had no disagreement with the Company that led to their respective resignations***."   The 12/4/2015 8-K called Retrophin as one of the "fastest growing biopharmaceutical companies in the history of the industry" and, referring to Biestek and Fernandez, touted that "***Employees #1 and #2 of Retrophin, Inc….have joined the Board of Directors of KaloBios***."   The 12/3/2015 Slides touted the "***Addition of experienced business development team led by Patrick Crutcher***."   Yet, as discussed below, Biestek, Fernandez, Harrison, and Crutcher were close Shkreli associates who participated in and facilitated his frauds at MSMB and Retrophin.

13.    Fourth, Shkreli made materially false and misleading misstatements and omissions regarding his own skills, qualifications, and abilities to lead KaloBios, based on his experience leading MSMB and Retrophin.   Among the most egregious examples, KaloBios's 11/23/2015 8-K recited actually Shkreli's experience as founder and CEO of Retrophin and as managing partner of MSMB before stating, in language that conveyed to investors that KaloBios had done diligence into Shkreli's past and determined it to actually be a positive attribute, "***The Company believes that Mr. Shkreli's prior experience, attributes and skills are indicators of his professional competence for the role as Chief Executive Officer of the Company***."

Similarly, in the 11/25/2015 Bloomberg Interview, Shkreli was asked why he would succeed at leading KaloBios, and he replied, "*I think it's credibility and trustworthiness*" and "*investors who have been in my last two companies know my track record is very good*."  However, unbeknownst to investors, there was no reasonable basis to believe that Shkreli's prior experiences at MSMB or Retrophin or his "attributes and skills" in perpetuating the frauds at those companies indicated any professional competence to believe that his "credibility and trustworthiness" would lead him to succeed in leading KaloBios.

14.     Due to these and other misstatements, KaloBios's stock experienced significant inflation during the Class Period, including, as discussed more fully below.  Finally, on December 16, 2015, a KaloBios Form 8-K that Defendant Shkreli wrote and signed announced the closing of the $8.2 million PIPES placement.  That day, KaloBios's stock closed at $23.59, which valued the Shkreli Group's 70% stake at $68.1 million.  With investors in the dark, the Shkreli's false and misleading statements caused KaloBios's stock to trade as high as $45.82 during the Class Period due to the inflation caused by Defendant Shkreli's fraud, in the process greatly enriching him and the other members of the Shkreli Group.

15.     The market was therefore shocked when Defendant Shkreli was *__led away in handcuffs__* on December 17, 2015, arrested based on a 30-page federal indictment, as superseded by a Superseding Indictment in June 2016 (both indictments together the "Shkreli Indictments"), which along with a contemporaneously filed 22-page SEC complaint (the "SEC Shkreli Complaint"), outlined the massive scale of Shkreli's fraudulent and illegal conduct at MSMB and Retrophin, the underpinning of which was Shkreli's desperate inability to pay off his own debts without committing frauds on others to secure the funds and securities necessary to do so.  KaloBios terminated Shkreli as CEO that day, as his outside lawyer at Kaye Scholer, Evan

Greebel was also arrested.  Investors came to understand what Shkreli already knew – that he lacked sufficient resources to deliver on the promises he had made while at the helm of KaloBios, that his hiring of leading executives from MSMB and Retrophin and his retention of top-tier private legal counsel were mirages that had failed to add any competence or insulation against malfeasance at KaloBios, and that Shkreli, contrary to his persistent denials and countersuits, had indeed committed criminal fraud at Retrophin and MSMB.  The funding and financing promised by Shkreli was completely illegitimate, non-viable, and only obtainable (if at all) through additional frauds, and lenzilumab did not stand any chance of approval with Shkreli leading KaloBios.  In reality, KaloBios remained on the brink of bankruptcy.

16.     On this news, KaloBios's stock plummeted 53% in pre-open trading before NASDAQ halted all trading so it could request more information from KaloBios.  NASDAQ put out a statement on December 17, 2015, stating it had halted trading at 6:48 a.m. and that trading would remain halted "until KaloBios Pharmaceuticals, Inc. has fully satisfied NASDAQ's request for additional information" as to the circumstances surrounding Shkreli's arrest.  With trading halted, the bad news piled up.  On December 21, 2015, KaloBios's independent accounting firm, Marcum LLP, hired less than two weeks earlier, resigned.  On December 24, 2015, NASDAQ announced that KaloBios's stock would be delisted due to Shkreli's arrests and other issues.  KaloBios filed for bankruptcy on December 29, 2015.  When KaloBios finally resumed trading, on the over the counter (OTC) market, on January 13, 2016, it opened at $2.51, reached an intra-day low of $1.02, and finally closed at $4.39.

17.     As a result of Defendant Shkreli's materially false and misleading statements and omissions, KaloBios securities traded at inflated prices during the Class Period.  After the fraud

was revealed, KaloBios's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and other Class members.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).   Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1391(b), as Settling Defendant KaloBios was headquartered in this district and many of the acts and practices complained of herein occurred in substantial part in this district.

20.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Active Parties

21.     Lead Plaintiff Kaniz Fatema purchased or otherwise acquired KaloBios common stock as described in Lead Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

22.     Lead Plaintiff Zeke Ingram purchased or otherwise acquired KaloBios common stock as described in Lead Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

23.     Lead Plaintiff Bhaskar R. Gudlavenkatasiva purchased or otherwise acquired KaloBios common stock as described in Lead Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

24.     Lead Plaintiff Abuhena M. Saifulislam purchased or otherwise acquired KaloBios common stock as described in Lead Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

25.     Plaintiff Austin Isensee purchased or otherwise acquired KaloBios common stock as described in Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

26.     Defendant Martin Shkreli, as described herein, gained control of KaloBios and then served as its CEO and Chairman during the Class Period, during which he made materially false and misleading misstatements and omissions as alleged herein.  Defendant Shkreli also co-founded MSMB (in September 2009) and Retrophin (in 2011), both of which he led prior to taking over KaloBios.

Former Parties

27.     Settling Defendant KaloBios was incorporated in Delaware and has a headquarters at 442 Littlefield Avenue, South San Francisco, California 94080.  During the Class Period, Defendant KaloBios made materially false and misleading misstatements and omissions as alleged herein.  The claims against Settling Defendant KaloBios were subject to the terms of the Partial Settlement.  However, KaloBios's Class Period misstatements, which gave rise to potential liability Exchange Act §10(b) and Rule 10b-5, provide the underlying predicate violations necessary for the Exchange Act §20(a) claim against Defendant Shkreli.  Since the filing of this lawsuit, KaloBios has undergone a name change and is now called Humanigen, Inc.

28.     Settling Defendant Ronald Martell, as described herein, served as KaloBios's Executive Chairman before and into the Class Period.  Settling Defendant Martell made materially false and misleading misstatements and omissions as alleged herein.  The claims against Settling Defendant Martell were subject to the terms of the Partial Settlement.

29.     Settling Defendant Herb Cross, as described herein, served as KaloBios's Chief Financial Officer before and into the Class Period.  Settling Defendant Cross made materially false and misleading misstatements and omissions as alleged herein pending final approval by the Court.  The claims against Settling Defendant Cross were subject to the terms of the Partial Settlement.

**KEY NON-PARTY ASSOCIATES OF DEFENDANT SHKRELI**

30.     Marek Biestek ("Biestek") is a long-time associate of Defendant Shkreli.  He was a Managing Member and Co-Founder of MSMB from September 2009 – 2011.  (He is the "MB" of MSMB, while Defendant Shkreli is the "MS" in its name.)  He served a variety of capacities over four years at Retrophin, including Vice President, Co-Head of Business Development. Biestek was part of Defendant Shkreli's investor group that gained a controlling interest in KaloBios, and KaloBios's Shkreli-controlled Board appointed him to serve as a KaloBios Director during the Class Period.

31.     Thomas Fernandez ("Fernandez") is another long-time associate of Defendant Shkreli.  He served as Co-Founder (with Defendant Shkreli) and Senior VP, Corporate Development at Retrophin from 2011 – August 2015.  He also served as President of MSMB. During the Class Period, KaloBios's Shkreli-controlled Board appointed Fernandez to serve as a KaloBios Director and as a member of its Audit Committee.

32.     Michael Harrison ("Harrison") is another long-time associate of Defendant Shkreli.  He served as an executive at multiple companies run by Defendant Shkreli, including service as Controller at Retrophin from July 2013 – November 2014.  During the Class Period, KaloBios's Shkreli-controlled Board appointed Harrison to serve as a KaloBios Director and as both a member of and the Chairman of its Audit Committee.

33.     Patrick Crutcher ("Crutcher") is another long-time associate of Defendant Shkreli.  He served as an executive at multiple companies run by Defendant Shkreli, including service as a key member of the business development team at Retrophin.  During the Class Period, Shkreli appointed Crutcher to serve as Head of Business Development at KaloBios.

34.     From February 2011 to September 2014, Evan Greebel ("Greebel"), a Partner at the law firm of Katten Muchin Rosenman LLP, served as lead outside counsel to Retrophin and, at various times, as counsel to Defendant Shkreli and MSMB.  Unbeknownst to KaloBios investors during the Class Period, Greebel was a full co-participant with Shkreli in the pre-Class Period fraudulent and illegal schemes at MSMB and Retrophin, for which Greebel was also indicted and arrested.  He now awaits his own criminal trial, which is scheduled for fall 2017 after it was severed from Shkreli's trial.

### NON-PARTY CONFIDENTIAL WITNESSES

35.     CW1 was the Senior VP of Business Development at KaloBios from April 2008 until July 1, 2015, reporting to CEO David Pritchard until his departure in January 2015 and thereafter reporting to Settling Defendant Cross.  CW1's many various job duties included being the main business person at KaloBios, in which capacity CW1 executed deals with other companies to form partnerships (*e.g.*, marketing and distribution deals for specific drugs), worked on marketing plans for products, and worked on strategic planning.

36.     CW2 was the head of drug safety at KaloBios from June 2013 to June 30, 2015, reporting to Chief Medical Officer Nestor Molfino until his termination in January 2015 and thereafter reporting to Susan Kramer, VP of Product and Portfolio Management.   CW2's responsibilities included monitoring safety and trial records for three KaloBios drugs undergoing clinical trials and, at times, preparing documents for review by potential investors in KaloBios.

37.     CW3 was the Senior Manager of Document Control at KaloBios from October 2007 to November 16, 2015, reporting to KaloBios's Head of Quality.   CW3's job duties included managing regulatory documents for the medical regulatory agencies, managing clinical documents, quality control, documenting standard operating procedures for filing and documentation, working with vendors on maintaining records and auditing those vendors.   CW3 also served as the chief company archivist, typically involved when any person or entity was performing due diligence on KaloBios.

38.     CW4 was the Senior Manager of Regulatory Operations at KaloBios from October 2007 to November 17, 2015, reporting to Charles Democko, Vice President of Regulatory Affairs.   CW4's job duties included preparing, editing, and assembling regulatory submissions for agencies such as the FDA.   If a clinical trial was approved, CW4 would also compile and work on the updates to the trial, including safety reports and annual reports until the study is completed.   CW4 also worked closely with KaloBios senior management, as CW4 was often authoring reports in which they were involved.

39.     CW5 was the Manager, Drug Safety Operations from August 2105 to January 31, 2016, reporting to KaloBios's Interim Development Leader Morgan Lam and, later, Senior Director of Clinical Science Ted Shih.   CW5 was responsible for managing the contact research organization (CRO) overseeing the KaloBios clinical trial of KB-003.   Among other things,

CW5 oversaw incoming cases and checked the CRO's work to ensure it was being done in compliance with the established study protocol.

40.     CW6 was the Head of Quality at KaloBios, responsible for all quality control and assurance of quality functions, and worked at KaloBios from September 2012 to November 2015, reporting to Senior Vice President of Regulatory Affairs Charles Democko.  CW6 oversaw the contract testing of study drugs and ensured quality was maintained at each manufacturer and reviewed documents related to manufacturing and testing of drug products.

## SUBSTANTIVE ALLEGATIONS

### KaloBios Suffers Operational Setbacks And Nears Closure

41.     Entering the Class Period, KaloBios's drug product candidates in clinical trials were lenzilumab or KB003, used to treat asthma patients, and KB004, used to treat patients with hematologic malignancies.   However, KaloBios was struggling, both operationally and financially.  Lenzilumab failed a Phase II trial in severe asthma, leading KaloBios's ex-partner Sanofi to abandon a partnership in which it had promised up to $255 million in milestones.  In January 2015, KaloBios disclosed that its KB001-A antibody failed to meet its primary endpoint in a Phase II study on bacterial infection related cystic fibrosis.  Layoffs and a CEO departure followed.  In its Form 10-Q for the period ended June 30, 2015, KaloBios disclosed that it had "incurred significant losses and had an accumulated deficit of $193.9 million" by that date.

42.     These failures and setbacks had devastating effects on KaloBios's workforce, as it tried to raise funds to continue operations.  In January 2015, CW2 met with Settling Defendant Cross and KaloBios's Head of Human Relations and was offered severance.  CW2 remained on staff until June 30, 2015, and as a contractor until July 2015, during which time Settling Defendant Cross and management told employees that KaloBios had funds to last through

summer 2015 and would try to raise money in fall 2015.  CW2's job duties included preparation of documents for review by potential investors, so CW2 knew KaloBios was then trying to recruit smaller investors, like other pharmaceutical companies that might invest in a particular KaloBios drug in development or partner in the development process, and knew that Geron and Threshold Pharmaceuticals conducted due diligence on KaloBios and its drugs.  In February 2015, CW1 was informed that CW1 was being laid off with seven others, due to the need to downsize and preserve cash.  Between then and the end of June 2015, when CW1 departed, CW1 received updates that Settling Defendant Cross was meeting with potential investors to raise money by November 2015.  CW3 and CW6 stated that Settling Defendant Cross held monthly meetings with KaloBios employees in which he expressed optimism that KaloBios could raise the money necessary to continue operations.

43.     However, these efforts failed.  CW4 said that KaloBios managers expressed concern in September or October 2015 that insufficient funds had been raised and that the prospects for doing so by year-end did not look good.  According to CW4, in October 2015, KaloBios staff was called in for what they thought was a regular monthly staff meeting, only to be told they would be laid off.  CW3 said KaloBios employees learned of the failure to raise necessary funds in November 2015.

44.     So, in a November 5, 2015 press release, KaloBios announced a 61% workforce reduction and the pursuit of "strategic alternatives."  In a Form 12b-25 notification of late filing of a Form 10-Q filed with the SEC on November 9, 2015, KaloBios announced that, as part of its restructuring, it would halt enrollment in its KB004 clinical study and that the "strategic alternatives" it was considering included "potentially the sale of the Company or its assets, or a

corporate acquisition" or, if those efforts failed, "further restricting activities, wind-down of operations and bankruptcy proceedings."  These efforts also failed.

45.     KaloBios announced in a November 13, 2015 press release that its limited cash resources precluded continued investigation of strategic alternatives, such that it discontinued its KB003 and KB004 development programs and engaged the Brenner Group to lead efforts to "wind down its operations" and liquidate its assets.  It quoted KaloBios's CFO and interim CEO as stating, "Recent discussions around a number of possible strategic transactions have ended, and as a result, the company believes it is highly unlikely that continuing to explore strategic alternatives could generate a viable transaction within the time frame allowed by our limited cash resources."  KaloBios instituted deep employee cuts.  CW5 was among those laid off on November 13, 2015, with the understanding that KaloBios was intending to "wind down operations."  CW5 said that the CRO and clinical sites were contacted and told to halt the KB-003 trial and told that it was cancelled.  CW6 also left KaloBios on November 13, 2015 and said no one at the company had been aware that Shkreli was interested in buying a controlling stake.

46.     On this news, KaloBios's stock closed at $0.90 on November 13, 2015.

**Defendant Shkreli Takes Control Of KaloBios**

47.     KaloBios issued the 11/18/2015 Press Release, which listed Settling Defendant Cross, KaloBios's CFO, as the corporate contact.  It stated, *inter alia*, that it "has been informed that an investor group comprised of Martin Shkreli and associates together have acquired more than 50% of the outstanding shares of KaloBios, and that the company is in discussions with Mr. Shkreli regarding possible direction for the company to continue in operation."  It also quoted KaloBios's Executive Chairman, Settling Defendant Martell, as stating,

> We have received communications from Mr. Shkreli informing us of his group's ownership position, and a proposal to continue the company's operations.  Our

board of directors is prepared to entertain any constructive proposal, which we will act upon promptly.  Addressing short-term cash needs is our first priority, and we continue to be open to further dialogue.

Together, these statements were the first public disclosures as to Defendant Shkreli's large ownership stake in KaloBios and his proposal for reviving it and running it going forward.  The Partial Settlement resolves the potential liability of the Settling Defendants for these statements.

48.     Notably, the specifics of Shkreli's proposal were closely guarded and restricted to the highest levels of KaloBios and its Board, as indicated by the statements of multiple CWs, who had no knowledge as to Shkreli's path to control over KaloBios and who, despite working in the pharmaceutical industry, did not describe any knowledge of or understanding as to the dangers posed by Shkreli's prior criminal conduct at MSMB or Retrophin.  CW3 indicated that, despite being KaloBios's chief archivist, CW3 had no knowledge of the process that led to Defendant Shkreli's investment and ascension as CEO.  CW6 said that very few people would have met with Shkreli, possibly including Settling Defendant Cross and KaloBios's legal counsel, Don Joseph.  CW4 never knew that Defendant Shkreli was a potential CEO for KaloBios and was never part of any discussion regarding his investment in KaloBios.  Instead, on CW4's last day, November 17, 2015, CW4 heard that a new CEO would be visiting KaloBios's offices.  CW5, having been laid off on November 13, 2015, was invited back to work on November 19, 2015, at which point CW5 learned that KaloBios had a new CEO.  CW5 was not familiar with Shkreli and had not known that he was a potential investor or that there even was a potential large investor.  Thereafter, CW5 described employee sentiment as having lifted amidst a feeling that KaloBios was "a new company."  CW5 called the KB-0003 clinical site and told them that KaloBios was still in business and to resume the KB-003 trial, which many agreed to do.  CW6 said that Shkreli effectively rescued the company.  Thus, KaloBios's own

employees, who likely know its business better than open market investors, viewed Shkreli as a savior.

49.     Significantly, as was later revealed to investors, *after* Shkreli had acquired majority control in KaloBios, it rejected an alternative funding proposal from a different source that had been on the table as of November 18, 2015.  Specifically, as KaloBios later disclosed, via a Form 8-K filed with the SEC on December 9, 2015, "On November 18, 2015, Armistice Capital Fund ('Armistice') advised the Company that it was prepared to provide an immediate equity infusion if the Company needed it to fund operations.  The Company elected not to accept such financing."  The Armistice offer was sufficiently substantial that, on December 4, 2015, KaloBios later awarded it a warrant to purchase an aggregate of 125,000 shares.  On information and belief, KaloBios rejected the Armistice proposal at the direction of Defendant Shkreli, who was by that point its majority shareholder and was either already its CEO and Chairman or was about to ascend to those roles and was effectively filling them already.  The rejection of an available funding option conveyed to the market the false impression that Shkreli could himself deliver the funding necessary to continue KaloBios's operations.

50.     Also significant is the fact that Defendant Shkreli's controlling stake, which swelled to 70.0% by November 23, 2015, was acquired for an average price of just $1.51 per-share.  As disclosed in a Form 8-K filed on November 23, 2015, Shkreli's group had purchased 2,885,000 shares of KaloBios for $4,363,853.00.  Defendant Shkreli was motivated to commit the fraud alleged herein, *inter alia*, to drive up the value of this newly-acquired majority stake through his false and misleading statements during the Class Period, in a pump-and-dump scheme designed to permit him to reap significant resale proceeds in just six months.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Shkreli's False and Misleading Statements During The Class Period**

51.    On November 19, 2015, KaloBios issued the 11/19/2015 press release, which was later filed with the SEC as an exhibit to a Form 8-K signed by Defendant Shkreli and filed with the SEC on November 23, 2015 (the "11/23/2015 8-K"), which was entitled "KaloBios Pharmaceuticals, Inc. Appoints Martin Shkreli CEO and Announces New Financing" and which listed "Martin Shkreli, KaloBios CEO" as the company contact and which he wrote, edited, and authorized.  It announced that the Shkreli Group had acquired 70% of KaloBios's outstanding shares and that he had been appointed its CEO and elected its Chairman.  In addition, it included numerous false and misleading statements, as follows:

(a)    It falsely and misleadingly touted Defendant Shkreli's leadership, his ability to secure necessary financing, and his ability to continue KaloBios's operations.  It stated, "***In his new role, Mr. Shkreli will work with the company's senior management team to <u>ensure</u> the Company's <u>continued operations</u>**.*"  It touted that "***KaloBios has received a <u>commitment</u> from Mr. Shkreli and other investors for an equity investment of at least $3.0 million*.  In addition, *Mr. Shkreli and the group of investors have committed to a $10 million equity financing facility*, subject to applicable shareholder approval.**"  It added, "The company has approximately $5 million in cash and will endeavor to file its quarterly results on Form 10-Q as soon as possible.  Mr. Shkreli will continue as Chief Executive Officer of Turing Pharmaceuticals AG and the two companies will operate independently."

(b)    The 11/19/2015 Press Release also falsely and misleadingly described the prospects for KaloBios's drug candidates, painting the false and misleading impression that Shkreli's leadership and financing would create a viable pathway toward FDA approval.  It quoted Shkreli as stating, "***We believe that the KaloBios' lenzilumab is a very promising***

*candidate for the treatment of various rare and orphan diseases*. This monoclonal antibody neutralizes soluble granulocyte-macrophage colony stimulating factor (GM-CSF), a central actor in leukocyte differentiation, autoimmunity and inflammation. Lenzilumab has particular promise in Chronic Myelomonocytic Leukemia (CMML), a disease with no FDA-approved treatment options and a 3-year overall survival rate of 20%." It added:

> An IND for a Phase I/II CMML monotherapy study of lenzilumab has been cleared by the Food and Drug Administration (NCT02546284). Preclinical studies have shown lenzilumab can be used to cause apoptosis in CMML cells by depriving them of GM-CSF. Lenzilumab may also have clinical utility in other rare autoimmune and inflammatory disorders. *A 31-patient Phase I/II clinical trial of lenzilumab* __will begin__ *enrollment at eight leading oncology clinical trial sites* __by year end 2015__ *with interim results possible as soon as the first half of 2016*.

52.     Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere *fraction* of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison,

rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums

"preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

53.    This press release had its intended effect, prompting investors to buy back into KaloBios, thereby rapidly driving up its stock price and greatly enhancing the value of Defendant Shkreli's newly-acquired majority stake.  After reaching an intra-day trading high of $14.72, KaloBios's stock closed at $10.40 on November 19, 2015, an increase of $8.33, or more than 400%, from its $2.07 closing price on November 18, 2015.  At this price, the Shkreli Group's 70% stake in KaloBios had risen in value to $30,004,000.00.

54.    On November 20, 2015, Defendant Shkreli gave an interview to Bloomberg News (the "11/20/2015 Bloomberg Interview"), in which he falsely and misleadingly said, "*I think we will grow KBIO into a large company*" and that he was *targeting the company to be the next Incyte or large blood-cancer developer* and that KaloBios needed to "*replenish the pipeline through discipline, diversification and value-based strategy*."

55.    Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As

Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

56.     Defendant Shkreli's misstatements again drove up KaloBios's stock price.  On November 20, 2015, its stock reached an intra-day high of $23.11 and closed at $18.25, up over

75% from its prior day's close of $10.40.    At this price, the Shkreli Group's 70% stake in KaloBios had risen in value to $52,651,250.00.

57.    Defendant Shkreli made false and misleading statements on Sunday, November 22, 2015, via his Twitter account (@MartinShkreli), when he stated, "CMML and JMML are rapidly fatal blood cancers. ***Lenxilumab, the important asset at $KBIO is an exciting potential agent for these diseases***."    The next day, he tweeted a message stating, "***Turnaround in progress.  $KBIO***" that included this picture:



58.    Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.    As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to

provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his

personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

59.     Defendant Shkreli made false and misleading statements in the 11/23/2015 8-KK, which he signed as its CEO and filed with the SEC on November 23, 2015 and which attached the 11/19/2015 Press Release as an exhibit.  The 11/23/2015 8-K announced leadership changes at KaloBios and touted Shkreli's prior experiences at other companies, including Retrophin and MSMB, in a series of false and misleading statements:

(a)     In announcing Defendant Shkreli's appointment as KaloBios's CEO, the 11/23/2015 8-K falsely and misleadingly touted his prior experiences, stating, *inter alia*:

> Martin Shkreli, age 32, is currently the Chief Executive Officer and is founder of Turing Pharmaceuticals AG.... From December 17, 2012 until October 13, 2014, Mr. Shkreli served as the ***Chief Executive Officer and as a director of Retrophin, Inc***.... (NASDAQ: RTRX), a biotechnology company that develops treatments for rare and catastrophic diseases. In March 2011, Mr. Shkreli ***founded Retrophin, LLC*** (the predecessor to Retrophin, Inc.) and served as the ***President of Retrophin, LLC*** from the date of its formation. Mr. Shkreli was also the ***founder and managing partner of MSMB Capital Management***, a New York hedge fund firm founded in 2006 that ceased to operate in 2013 that managed a variety of partnerships. Mr. Shkreli is an experienced biotechnology and pharmaceutical industry investor, particularly in businesses with orphan drugs. Mr. Shkreli received his Bachelors of Business Administration from Baruch College. ***The Company believes that Mr. Shkreli's prior experience, attributes and skills are indicators of his professional competence for the role as Chief Executive Officer of the Company***.

(b)     The 11/23/2015 8-K misleadingly announced that on November 19, 2015, KaloBios's Shkreli-controlled Board ***appointed Shkreli as its Chairman*** and ***appointed numerous Shkreli associates as members of the Board, including Biestek***, MSMB's Co-Founder and a longtime Retrophin executive.  It stated that, thereafter, the then-current Board members resigned, "effective immediately after such appointments," falsely or misleadingly adding, "***The Resigning Directors had no disagreement with the Company that led to their respective resignations***."

(c)     In addition, the 11/23/2015 8-K misleadingly announced that the newly-appointed and Shkreli-controlled Board had appointed other longtime Shkreli associates from Retrophin and MSMB to Board positions, stating, "***On November 22, 2015, the Board appointed Tom Fernandez and Michael Harrison as members of the Board and members of the Board's Audit Committee, with Mr. Harrison appointed as chairman of such committee***."

(d)     The 11/23/2015 8-K also falsely and misleadingly stated that "Under [NASDAQ's listing] rules, the Company has 60 calendar days from November 17, 2015 to submit a plan to NASDAQ to regain compliance with the Rules. *The Company intends to file the 2015 Third Quarter 10-Q prior to such date and will submit a compliance plan to NASDAQ on or prior to January 16, 2016*."

60.     Unbeknownst to investors, there was no justifiable basis for the 11/23/2015 8-K's statement of belief that Shkreli's prior experience at MSMB and Retrophin, in light of the criminal fraud he perpetrated there as discussed herein, indicated his professional competence. Nor did Shkreli exhibit "attribute and skill" making him fit to serve as KaloBios's CEO.  Indeed, Steve Richardson, Retrophin's CEO during the period of Shkreli's fraud, testified at Shkreli's criminal trial that Shkreli had disobeyed directions form Retrophin's Board as of September 2014, by setting up a system to pay Retrophin employees commissions so as to encourage them to trade stocks, a fact that Shkreli denied when asked by Richardson.  As Richardson testified, "I was stunned.  As a board member – I'm the chairman at the time – he's lying to my face."  In addition, contrary to these statements, unbeknownst to KaloBios investors, Biestek, Fernandez, Harrison, and Crutcher played crucial roles in the frauds at MSMB and Retrophin, which could not have occurred without their participation and assistance and which ultimately led to Defendant Shkreli's criminal trial and conviction.  Specifically:

(a)     On information and belief, Biestek was "Corrupt Employee 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  He has been Defendant Shkreli's closest business partner throughout all relevant periods – at MSMB, then Retrophin, then KaloBios.  As co-founder (with Shkreli) of MSMB and as a long-time leader of Retrophin during the frauds at issue in Shkreli's criminal trial, Biestek knew or was willfully

reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  At Shkreli's criminal trial, accountant Corey Massella, whose firm SEC Securities (which later became Citron Cooperman), testified that the stock ownership tables at Retrophin repeatedly changed to a frustrating degree, including an instance in 2012 that prompted Massella to email Shkreli "WTF?" after the stock ownership tally grew by over 4,000 shares after Shkreli was given them by Biestek in what Shkreli told the accountants was merely "for value received."  Biestek's participation in Shkreli's investor group that took control of KaloBios, as well as his later appointment by Shkreli to serve as a KaloBios Director further evidence both Bietek's pre-investment due diligence into Shkreli's conduct at MSMB and Retrophin and his complicity in Shkreli's frauds in those companies.  Biestek stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Biestek's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

  (b)  On information and belief, Fernandez was "Corrupt Employee 2," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  As co-founder (with Shkreli) of Retrophin and as President of MSMB, both of which he led throughout the entire period of Shkreli's fraud, Fernandez knew or was willfully reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  His later appointment by Shkreli to serve

as a KaloBios Director and Audit Committee member further evidences Fernandez's complicity in Shkreli's frauds in those companies.  Fernandez stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Fernandez's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

(c)     On information and belief, either Harrison or Crutcher was "Co-Conspirator 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  Both are long-time business associates of Shkreli's, and their roles at Retrophin – Controller and Head of Business Development, respectively – positioned them so that they knew or were willfully reckless in not knowing of the circumstances that led to Shkreli's conviction, including the raiding of Retrophin assets to bail out MSMB and its principals.  Their later appointments by Shkreli, Harrison as KaloBios Director and Audit Committee Chairman and Crutcher as KaloBios Head of Busines Development – further evidence their complicity in Shkreli's Retrophin fraud.  Harrison and Crutcher stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend them that opportunity is most credibly understood as reward for loyalty and a payback for their roles in the Retrophin fraud.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

61.     Once again, Defendant Shkreli's misstatements had the desired effect.  On November 23, 2015, KaloBios's stock reached an intra-day high of $45.82 and closed at $39.50, up over 200% from its prior day's close of $18.25.  At this price, the Shkreli Group's 70% stake in KaloBios had risen in value to $113,957,500.00.

34

62.     On November 24, 2015, Defendant Shkreli gave an interview to NBC Bay Area (the "11/24/2015 NBC Interview"), in which said, he falsely and misleadingly said, "We've been watching KaloBios for some time, and then we finally felt that it time to buy the company" and that "*At the end of the day my constituency is* not the media, it's *my investors, who I work for*, and the patients who we all work for together."  As regards KaloBios's staff, he falsely and misleadingly said, "*Right now, we're about 12, and we're looking to double and triple that number over the next few months*."

63.     Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere *fraction* of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+

Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)      Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)      Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on

Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

64.    Defendant Shkreli's misstatements again had the desired effect.  On November 24, 2015, KaloBios's stock reached an intra-day high of $43.75 before closing at $18.40, a price at which the Shkreli Group's 70% stake in KaloBios would be worth $53,084,000.00.

65.    On November 25, 2015, Defendant Shkreli gave an interview with Bloomberg (the "11/25/2015 Bloomberg Interview"), in which he made extensive false and misleading statements, including, *inter alia*:

(a)    Defendant Shkreli falsely and misleadingly touted the progress being made on KaloBios's drug candidates, stating, "The main asset of the company is a drug called lenzilumab, which is a potential drug for chronic myelomonocytic leukemia.  ***Trials starting right now actually, so we're really excited to see that…and we'll know in Q1 or Q2 if our trial works***."

(b)    He falsely and misleadingly touted the advantages of his and his associates' leadership of KaloBios, including access to needed funds, stating, "***[W]e*** went in and we bought the company in the open market ourselves and ***named ourselves the management*** - - new management of the company, and ***now the company has the cash to do this clinical trial that could be a life-saving drug for cancer patients***."

(c)     He falsely and misleadingly boasted as to the strength of KaloBios's business, stating, "We're focused on creating the value of KaloBios through not only lenzilumab, but *__I expect that we could announce__* in acquisition for *__KaloBios to acquire new products as soon as by the end of this year__*. In fact, *__we're in talks with three separate acquisitions__* *that could create even more value for KaloBios*."   When asked for details as to whether the drugs were for treatment of common or rare diseases, he falsely and misleadingly added, "*__Probably rare diseases__*. *Two of them are not yet FDA approved, and one of them is FDA approved*. *So __all three are progressing rapidly__ and could be great fits for KaloBios*."

(d)     When asked why he would succeed at leading KaloBios whereas its prior leadership had failed, he falsely and misleadingly stated

> *__I think it's credibility and trustworthiness.__*   This is a company that tried lenzilumab in rheumatoid arthritis, and they failed.  They tried it in asthma.  They failed.  And so the third attempt, if you ask investors to fund yet another program, it often is not going to be received very well.  *So I think when we came in with fresh capital and fresh ideas and said we underwrite this; we support this*.  And *__investors who have been in my last two companies know my track record is very good__*, and I think we'll see success with lenzilumab in CMML.

(e)     Defendant Shkreli falsely and misleadingly committed to fund KaloBios's ongoing drug candidate development work, stating, "*__KaloBios needs another $100 million that I'm going to give to it__* so that we can develop lenzilumab for CMML*."

66.     Unbeknownst to investors, there was no justifiable basis for the statement touting Shkreli's "credibility and trustworthiness" or his "very good" "track record" at his prior two companies, in light of the criminal fraud he perpetrated there as discussed herein.  Indeed, Steve Richardson, Retrophin's CEO during the period of Shkreli's fraud, testified at Shkreli's criminal trial that Shkreli had disobeyed directions form Retrophin's Board as of September 2014, by setting up a system to pay Retrophin employees commissions so as to encourage them to trade

stocks, a fact that Shkreli denied when asked by Richardson.  As Richardson testified, "I was stunned.  As a board member – I'm the chairman at the time – he's lying to my face." In addition, unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted above, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)      The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000

Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his

stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

67.     Also on November 25, 2015, Defendant Shkreli and the members of his investor group including Biestek, filed a Schedule 13D with the SEC (the "11/25/2015 13D"), in which they are referred to as the "Reporting Persons" and which they signed and certified via the false and misleading statement:  "*After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct*." After disclosing that the Reporting Persons had acquired a majority of KaloBios's common shares on November 17, 2015, the 11/25/2015 13D falsely and misleadingly stated, "On November 18, 2015, the Reporting Persons *made a proposal to [KaloBios] regarding financing options* (*including those that may lead to the acquisition of additional securities of [KaloBios] by the Reporting Persons and third parties*, and those that would lead to a material change in the present capitalization of [KaloBios]), *continuing operations of [KaloBios]* and a change in [KaloBios]'s management and composition of the Board."  It then disclosed the appointment of Shkreli as CEO and Chairman of the Board on November 19, 2015 and the appointment of his associates, including Biestek, Fernandez, and Harrison, as Board members on November 19 and 22, 2015.

68.     Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted above, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to

provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his

personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

69.     Once again, Defendant Shkreli's misstatements boosted KaloBios's stock price. On November 25, 2015, its stock closed at $26.63, up nearly 45% from its prior day's close at $18.40.  At this price, the Shkreli Group's 70% stake in KaloBios was worth $76,827,550.00.

70.     On December 3, 2015, KaloBios issued press releases that were written, edited, and authorized by Defendant Shkreli and that quoted him, in which additional false and misleading statements were made, as follows:

(a)     One press release, entitled "KaloBios Announces Management Additions" (the "12/3/2015 Management Press Release"), touted the appointment of several Shkreli associates to executive positions, including Retrophin alumnus Crutcher as KaloBios's Head of Business Development.  In it, regarding the announced appointments, Defendant Shkreli falsely and misleadingly stated, "***We are moving quickly to build a very high quality team*** focused on optimizing the growth opportunities at KaloBios Pharmaceuticals."

(b)     Another press release, entitled "KaloBios Announces Agreement to Acquire Benznidazole Program for the Treatment of Chagas Disease" (the "12/3/2015 Benznidazole Press Release"), announced that KaloBios had signed an agreement to acquire a benznidazole program for the treatment of Chagas Disease from privately-held Savant Neglected Diseases, LLC, in exchange for an upfront payment of $2 million plus regulatory milestones and a royalty based on product sales.  It quoted Defendant Shkreli as falsely and misleadingly saying, *inter alia*, "Benznidazole is an extremely important medicine that is currently unavailable in the United States or Europe.  ***KaloBios will work to bring this vital therapy to help patients avoid progression to Chagas' cardiomyopathy by offering early disease intervention***."

71.     Contrary to these statements, unbeknownst to KaloBios investors, Biestek, Fernandez, Harrison, and Crutcher played crucial roles in the frauds at MSMB and Retrophin, which could not have occurred without their participation and assistance and which ultimately led to Defendant Shkreli's criminal trial and conviction.  Specifically:

(a)      On information and belief, Biestek was "Corrupt Employee 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  He has been Defendant Shkreli's closest business partner throughout all relevant periods – at MSMB, then Retrophin, then KaloBios.  As co-founder (with Shkreli) of MSMB and as a long-time leader of Retrophin during the frauds at issue in Shkreli's criminal trial, Biestek knew or was willfully reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  At Shkreli's criminal trial, accountant Corey Massella, whose firm SEC Securities (which later became Citron Cooperman), testified that the stock ownership tables at Retrophin repeatedly changed to a frustrating degree, including an instance in 2012 that prompted Massella to email Shkreli "WTF?" after the stock ownership tally grew by over 4,000 shares after Shkreli was given them by Biestek in what Shkreli told the accountants was merely "for value received."  Biestek's participation in Shkreli's investor group that took control of KaloBios, as well as his later appointment by Shkreli to serve as a KaloBios Director further evidence both Bietek's pre-investment due diligence into Shkreli's conduct at MSMB and Retrophin and his complicity in Shkreli's frauds in those companies.  Biestek stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Biestek's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

(b)      On information and belief, Fernandez was "Corrupt Employee 2," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  As co-

founder (with Shkreli) of Retrophin and as President of MSMB, both of which he led throughout the entire period of Shkreli's fraud, Fernandez knew or was willfully reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  His later appointment by Shkreli to serve as a KaloBios Director and Audit Committee member further evidences Fernandez's complicity in Shkreli's frauds in those companies.  Fernandez stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Fernandez's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

(c)     On information and belief, either Harrison or Crutcher was "Co-Conspirator 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  Both are long-time business associates of Shkreli's, and their roles at Retrophin – Controller and Head of Business Development, respectively – positioned them so that they knew or were willfully reckless in not knowing of the circumstances that led to Shkreli's conviction, including the raiding of Retrophin assets to bail out MSMB and its principals.  Their later appointments by Shkreli, Harrison as KaloBios Director and Audit Committee Chairman and Crutcher as KaloBios Head of Busines Development – further evidence their complicity in Shkreli's Retrophin fraud.  Harrison and Crutcher stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend them that opportunity is most credibly understood as reward for loyalty and a payback for their roles in the Retrophin

fraud.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

72.     On December 3, 2015, KaloBios held a conference call (the "12/3/2015 Conference Call") in which it discussed the substance of the three press releases issued that day. In conjunction therewith, Defendant Shkreli and Settling Defendant KaloBios issued a slide presentation (the "12/3/2015 Slides"), which they posted to KaloBios's corporate website and filed as an attachment to a Form 8-K (the "12/4/2015 8-K"), dated and signed by Defendant Shkreli as KaloBios's CEO on December 3, 2015 and filed with the SEC on December 4, 2015. The 12/3/2015 Slides, which were written, prepared, and authorized by Defendant Shkreli, made numerous materially false and misleading statements, including, *inter alia*:

(a)     They falsely and misleadingly touted that "*The Shkreli Group had acquired a controlling stake of KaloBios,*" that "*Martin Shkreli named Chairman and CEO of KaloBios,*" and that these developments meant "*Permanent access to capital and M&A deal flow.*"

(b)     They falsely and misleadingly stated that KaloBios's "Turnaround focused on benznidazole and lenzilumab" and included development details and specific timelines, stating, *inter alia*, that KaloBios would "*File NDA [for benznidazole] by Year End 2016*" and was otherwise "*Focused on lenzilumab (formerly KB003)*" and was "*Initiating Phase 1 / 2 study in CMML by YE 2015*" (just weeks away) and would "*Initiate Phase 2 study in JMML in 1H 2016*" and "*Initiate multiple proof-of-concept studies for new orphan indications in 2016.*"

(c)     The 12/3/2015 Slides also falsely and misleadingly represented KaloBios's "Corporate Milestones," stating that in "*December 2015*" it would "*Close Savant transaction*" and "*File 10-Q with new audit firm,*" while "*KB003 CMML Phase I Study first patient dosed.*"

73.     Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had

used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

74.     In addition, the 12/3/2015 Slides and 12/4/2015 8-K made the following false and misleading statements regarding KaloBios's leadership:

(a)     The 12/3/2015 Slides also falsely and misleadingly touted that "***Employees #1 and #2 of Retrophin, Inc. (NASDAQ: RTRX have joined the Board of Directors of KaloBios***" and that "***Turing and Retrophin are two of the fastest growing biopharmaceutical companies in the history of the industry***."

(b)     The 12/3/2015 Slides also falsely and misleadingly represented KaloBios's "Business Development" prospects, touting the "***Addition of experienced business development team led by Patrick Crutcher***" and representing that "***KaloBios is in near-term negotiations to acquire several assets in the next 30 to 90 days***" and that "***Opportunities include transactions with large pharma, biotech and specialty pharma companies***."

75.     Contrary to these statements, unbeknownst to KaloBios investors, Biestek, Fernandez, Harrison, and Crutcher played crucial roles in the frauds at MSMB and Retrophin, which could not have occurred without their participation and assistance and which ultimately led to Defendant Shkreli's criminal trial and conviction.  Specifically:

(a)     On information and belief, Biestek was "Corrupt Employee 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  He has been Defendant Shkreli's closest business partner throughout all relevant periods – at MSMB, then Retrophin, then KaloBios.  As co-founder (with Shkreli) of MSMB and as a long-time leader of Retrophin during the frauds at issue in Shkreli's criminal trial, Biestek knew or was willfully reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB

investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  At Shkreli's criminal trial, accountant Corey Massella, whose firm SEC Securities (which later became Citron Cooperman), testified that the stock ownership tables at Retrophin repeatedly changed to a frustrating degree, including an instance in 2012 that prompted Massella to email Shkreli "WTF?" after the stock ownership tally grew by over 4,000 shares after Shkreli was given them by Biestek in what Shkreli told the accountants was merely "for value received."  Biestek's participation in Shkreli's investor group that took control of KaloBios, as well as his later appointment by Shkreli to serve as a KaloBios Director further evidence both Bietek's pre-investment due diligence into Shkreli's conduct at MSMB and Retrophin and his complicity in Shkreli's frauds in those companies.  Biestek stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Biestek's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

(b)    On information and belief, Fernandez was "Corrupt Employee 2," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  As co-founder (with Shkreli) of Retrophin and as President of MSMB, both of which he led throughout the entire period of Shkreli's fraud, Fernandez knew or was willfully reckless in not knowing of the full circumstances that led to Shkreli's conviction, as described below, *i.e.*, MSMB's near-total loss of investor funds, the false promises made to MSMB investors, and the raiding of Retrophin assets to bail out MSMB and its principals.  His later appointment by Shkreli to serve as a KaloBios Director and Audit Committee member further evidences Fernandez's complicity in Shkreli's frauds in those companies.  Fernandez stood to benefit financially from Shkreli's

pump-and-dump scheme at KaloBios, and Shkreli's decision to extend him that opportunity is most credibly understood as reward for loyalty and a payback for Fernandez's role in the frauds at MSMB and Retrophin.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

(c)     On information and belief, either Harrison or Crutcher was "Co-Conspirator 1," as that term was employed in the Shkreli Indictments and SEC Shkreli Complaint (defined below).  Both are long-time business associates of Shkreli's, and their roles at Retrophin – Controller and Head of Business Development, respectively – positioned them so that they knew or were willfully reckless in not knowing of the circumstances that led to Shkreli's conviction, including the raiding of Retrophin assets to bail out MSMB and its principals.  Their later appointments by Shkreli, Harrison as KaloBios Director and Audit Committee Chairman and Crutcher as KaloBios Head of Busines Development – further evidence their complicity in Shkreli's Retrophin fraud.  Harrison and Crutcher stood to benefit financially from Shkreli's pump-and-dump scheme at KaloBios, and Shkreli's decision to extend them that opportunity is most credibly understood as reward for loyalty and a payback for their roles in the Retrophin fraud.  Such an approach fits into his pattern, established at his criminal trial, of improperly using his later business ventures as a means to repay debts run up at his prior ones.

76.     KaloBios also announced the purported raising of significant funds via the PIPES private placement on December 3, 2015, in the 12/3/2015 8-K.  Specifically, the 12/3/2015 8-K attached a press release, entitled "KaloBios Pharmaceuticals, Inc. Raises $8.2 Million in Private Placement" (the "12/3/2015 Funding Press Release"), which misleadingly stated:

> KaloBios Pharmaceuticals, Inc. (Nasdaq: KBIO), today announced it has entered definitive agreements with institutional and accredited investors in connection with a private placement, or PIPE financing. ***Upon closing of the transaction, the Company will receive gross proceeds of approximately $8.2 million*** in exchange

for the issuance to investors of 280,170 shares of common stock of the Company. The Company may increase the number of shares sold based on additional definitive agreements that may be received. ***Closing of the transaction is anticipated to occur the week of December 7, 2015*** and is subject to customary closing conditions.

***The Company intends to use the proceeds from the PIPE financing for an acquisition and to advance its pipeline of drug candidates, including its lead compound, lenzilumab*** for the treatment of myelomonocytic leukemia (CMML).

77.     Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)     The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison, rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months,

primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums "preposterous" and said, "He doesn't have any cash."  In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios

needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

78.     The 12/3/2015 8-K also attached the Securities Purchase Agreement for the PIPES transaction, which, among other things listed Evan Greebel's law firm, ***Kaye Scholer***, as KaloBios's "Company Counsel" for the PIPES transaction and stated, "***There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission of the Company or any current or former director or officer of the Company.***"

79.     These statements were materially false and misleading because this statement misled investors to believing that there was no longer any pending investigation by the SEC against Shkreli, a statement to which it lent credibility by specifically listing as Kaye Scholer, a nearly 100 year-old, international law firm with hundreds of attorneys and a strong reputation, as KaloBios's "Company Counsel" for the PIPES transaction.  Unbeknownst to investors, however, both Shkreli ***and his lawyer at Kaye Scholer*** were not only under investigation by the SEC, they remained under criminal investigation and were on the cusp of indictment and arrest, and the PIPES transaction was simply another angle of Shkreli's fraud at KaloBios.  As detailed herein, Greebel, as Shkreli's lawyer at Kaye Scholer was a full, co-conspiring participant in Shkreli's frauds at MSMB and Retrophin, and he faces his own upcoming criminal trial.

80.     The misstatements on December 3, 2015 continued the price inflation of KaloBios's stock during the Class Period.  After reaching an intra-day high of $34.30, its stock price closed at $29.32 on December 3, 2015.  After reaching an intra-day high of $34.63, it

closed at $31.13 on December 4, 2015.   At these prices, the Shkreli Group's 70% stake in KaloBios was worth between $84,588,200.00 and $89,810,050.00.  The same day, Defendant Shkreli re-tweeted a day trader's post touting KaloBios's value: "$KBIO worth minimum $60 bucks per share."

81.    On December 16, 2015, KaloBios filed a Form 8-K with the SEC (the "12/16/2015 8-K"), which Defendant Shkreli wrote, edited, authorized, and signed as KaloBios's CEO, stating that it had consummated a transaction to sell 350,224 shares of KaloBios common stock in an $8.2 million private placement via an amended securities purchase agreement that it appended as an exhibit.

82.    Unbeknownst to investors, but as later revealed in the Shkreli Indictments and the SEC Shkreli Complaint as set forth *infra*, these statements were materially false and misleading due, *inter alia*, Shkreli's lack of sufficient personal resources to fund KaloBios's operations.  As Shkreli admitted in the 11/25/2015 Bloomberg Interview, quoted below, at the time of the Class Period "KaloBios need[ed] another $100 million" to funds its operations, which he promised to provide.  There is vast evidence that Shkreli simply did not possess that level of resources during the Class Period, including, *inter alia*:

(a)    The frauds Shkreli perpetrated at MSMB and Retrophin arose from his inability to cover trading liabilities that were a mere ***fraction*** of the amount he claimed that KaloBios needed and that he would provide to it.  Time and again, witnesses at his criminal trial testified that, when Shkreli's bad investment bets at MSMB cost them their account balances, he resorted to an illegal pilfering of a publicly-traded company, Retrophin, to pay them off, rather than simply repay them with his own purported funds.  In other words, Shkreli resorted to large-scale, complex securities fraud, for which he has been convicted and now faces 20 years in prison,

rather than merely dip into his own purportedly vast wealth.  For instance, he did so to pay back Richard Kocher's lost $200,000 investment (repaid, after five months, primarily with 47,000+ Retrophin shares in 2012), Sarah Hassan's lost $300,000 investment (repaid, after two years, primarily with 58,000+ Retrophin shares in April 2013), John Neill (repaid, after five months, primarily with 94,000 Retrophin shares in 2013), Dr. Lindsay Rosenwald's lost $200,000 investment (repaid, after two years, primarily with 80,000 Retrophin shares in 2013), and Darren Blanton's lost $1.25 million investment (repaid, after three years, primarily with 160,000 Retrophin shares in 2014).  Retrophin's CEO, Stephen Aselage, testified that Retrophin's Board never approved any of the settlement and consulting agreements, pursuant to which Shkreli had used Retrophin shares to repay these and other investors.  That he would engage in such risky behavior, so soon before the Class Period, is strong evidence that he simply lacked the funds he claimed to possess and that he promised to provide to KaloBios.

(b)     Further evidence of his lack of resources is the fact that, during the period of the MSMB and Retrophin fraud, Shkreli moved more than $1.3 million from Retrophin to his personal account, as per the testimony of forensic accountant Wendy Spaulding.  Such a blatant theft from the accounts of a publicly-traded company, visible on its bank records (which were used by Ms. Spaulding in her analysis), can only credibly be explained by Shkreli's desperate need for funds which he otherwise lacked.

(c)     Indeed, by the start of criminal trial, Shkreli admitted that he had not paid the legal bills of his defense counsel in this action, that he had not paid monies owed to the IRS, and that he owed payments to accountants addressing his tax problems, such that he asked the judge overseeing his trial to release half his bail money ($3 million) to satisfy these various financial obligations.  His own criminal counsel called Shkreli's promises to pay various six-figure sums

"preposterous" and said, "He doesn't have any cash."   In fighting Shkreli's request for a bail reduction, the prosecution, with a vested interest in putting as high a figure as possible on Shkreli's wealth, said that he had told federal authorities that his total net worth was $70 million when he was arrested in December 2015 – well short of the $100 million that he said KaloBios needed and that he promised to provide.  Moreover, his criminal lawyer explained that Shkreli has no bank accounts and no valuable assets other than his share in privately-held Turing Pharmaceuticals (worth $30 - $50 million), which he is *restricted from selling* due to the way his stake is structured.  So, even that $70 million figure is an illusion, as most if not all of it is an illiquid stake in a privately-held company that could not be used to fund KaloBios's operations.

83.     On December 16, 2015, KaloBios's stock closed at $23.59, after reaching an intra-day high of $25.30.  At these prices, the Shkreli Group's 70% stake in KaloBios was worth $68,057,150.00.

### The Truth Begins To Emerge

84.     The market was shocked when investors awoke to the news that Defendant Shkreli had been led away in handcuffs during his pre-market-open arrest on December 17, 2015.  He was immediately terminated as KaloBios CEO that same day.

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

85.     Shkreli's arrest was based on misconduct outlined in a 30-page federal indictment unsealed on December 17, 2015 (and superseded in June 2016), which along with a 22-page SEC complaint filed that day, outlined the massive scale of Shkreli's fraudulent and illegal conduct at his other companies and ventures, including Retrophin and MSMB.  Significantly, Defendant Shkreli had taken associates of his with high-ranking positions at these *very same* companies – Biestek, Fernandez, Harrison, and Crutcher – and appointed them to high-level leadership positions at KaloBios during the Class Period, and in doing so, touted their experience and his own experience leading those companies as positive attributes for KaloBios investors.  He had also hired as KaloBios's outside lawyers and "Company Counsel" in the PIPES transaction the law firm of Kaye Scholer, despite the fact that Kaye Scholer attorney Evan Greebel was a co-conspirator in Shkreli's frauds at MSMB and Retrophin who was *likewise arrested* the same day.

86.     The SEC Shkreli Complaint and the Shkreli Indictments contained new information that materially altered the total mix of information for KaloBios investors.  They

included, *inter alia*, the following details that were material omissions from the false and misleading Class Period statements alleged *supra*, all of which also constituted additional reasons why those misstatements had been materially false and misleading when made:

(a)     ***Shkreli stole funds from MSMB***.  Defendant Shkreli misappropriated funds from MSMB by withdrawing funds from MSMB that were far in excess of the 1% management fee and the 20% net profit incentive allocation permitted by the MSMB partnership agreement. Without the knowledge or consent of the Capital Limited Partners of MSMB, Shkreli withdrew and spent more than $200,000.00 from MSMB during the life of the fund, which was far in excess of any permitted fees.  Part of the drastic decline in MSMB's value was attributable to the fact that between October 2009 and January 2011, over $450,000.00 invested in MSMB was used to pay expenses, and at least $120,000.00 of these expenses were not properly chargeable to MSMB under the terms of the partnership agreement, including charges for office rent, food, medical expenses, clothing and cash withdrawals.

(b)     ***Shkreli fraudulently induced investments in MSMB***.  Between September 2009 and December 2010, Defendant Shkreli misrepresented material facts to potential investors, including, *inter alia*, that MSMB was a transparent investment vehicle with monthly liquidity, the investment advisor was entitled to a 1% management fee per annum based on net partnership assets, the general partner was entitled to 20% of the limited partners' annual net profits, and MSMB had retained independent certified public accountants as auditors who would issue an audit report on MSMB's annual financials.  Based on these statements and representations about Shkreli's success as a portfolio manager and personal investment in MSMB, between September 2009 and November 2010, he induced $700,000.00 in MSMB investments from four Capital Limited Partners.  In actuality, however, MSMB did not retain an independent auditor, was not

transparent, and lacked sufficient monthly liquidity to satisfy large redemption requests. Moreover, Shkreli failed to disclose that he had lost all of the money he managed in Elea Capital, his prior hedge fund, and that there was a $2.3 million default judgment against him from Lehman Brothers resulting from his trading activity.

(c)   ***Shkreli lied to MSMB's largest investors***.  On or about December 2, 2010, a potential large investor being solicited by Defendant Shkreli for investment in MSMB asked him about MSMB's assets under management and for the names of its independent auditor and fund administrator.  Shkreli responded by saying MSMB had $35 million in assets under management and that MSMB's independent auditor and administrator were Kass & Company, P.C. and NAV Consulting.  In reliance on these representations, the investor invested $1.25 million in MSMB in December 2010 and January 2011, and seven other investors invested another $1.75 million. However, at the time of Shkreli's representations, MSMB did not have an independent auditor or administrator and the total value of assets in its bank and brokerage accounts was just $700.00.

(d)   ***Shkreli deceived a broker to MSMB and failed to deliver promised securities***. On or about February 1, 2011, Defendant Shkreli took a large short sale position in Orexigen Therapeutics, Inc. ("Orexigen") in MSMB's brokerage account at Merrill Lynch.   Shkreli represented to Merrill Lynch that he had located Orexigen shares to borrow in order to settle MSMB's short sales when, in actuality, he had not located such shares.  As a result, MSMB failed to settle a short position of over 11 million Orexigen shares, which Merrill Lynch had to close at a loss of over $7 million.  These and other trading losses dropped MSMB's total account balances to just $58,500.00 by the end of February 2011.

(e)   ***Shkreli worked with his Kaye Scholer lawyer, Biestek, and Fernandez to defraud Retrophin into settling MSMB debts and personal debts***.  Between February 2011 and

September 2014, Defendant Shkreli and Greebel, who served as Retrophin's lead outside counsel and at times as counsel to Shkreli and MSMB – and whose law firm, Kaye Scholer – was later hired by Shkreli to serve as KaloBios's outside legal counsel and its "Company Counsel" in the PIPES transaction – engaged in a scheme to defraud Retrophin by causing Retrophin:  to transfer Retrophin securities to MSMB, even though MSMB had never invested in Retrophin; to enter into settlement agreements with defrauded MSMB investors to settle liabilities owed by MSMB and Shkreli; and to enter into sham consulting agreements with other defrauded MSMB investors and an Elea Capital investor as an alternative means to settle liabilities owed by MSMB and Shkreli.  Shkreli's and Greebel's scheme was aided by "Corrupt Employee 1" and "Corrupt Employee 2," identified in the Shkreli Indictments as "individuals employed by Shkreli" who, as alleged above, on information and belief, were Biestek and Fernandez.

(f)     ***Shkreli worked with his Kaye Scholer lawyer, Biestek, Fernandez, and Harrison or Crutcher to fabricate MSMB investments in Retrophin.***  Defendant Shkreli and Greebel, along with others including "Corrupt Employee 1" and "Corrupt Employee 2," engaged in a scheme to fabricate an investment by MSMB in Retrophin through a series of fraudulent transactions backdated to the summer of 2012.  In or about November and December 2012, Shkreli and Greebel orchestrated a transfer of shares to Shkreli from "Co-Conspirator 1," as well as "Corrupt Employee 1" and "Corrupt Employee 2"; backdated them to the summer of 2012; and then Shkreli transferred, pursuant to a backdated agreement, 75,000 shares to MSMB that he received from "Co-Conspirator 1," "Corrupt Employee 1" and "Corrupt Employee 2."   Shkreli and Greebel compensated "Co-Conspirator 1," "Corrupt Employee 1" and "Corrupt Employee 2" for their roles in this scheme by providing them with the opportunity to acquire, for a nominal

amount, 5% of Retrophin's unrestricted or free trading shares.  As alleged above, on information and belief, "Co-Conspirator 1" was either Harrison or Crutcher.

The scheme involving Shkreli, Greebel, and the scheme's other participants was well-documented, as evidenced by, *inter alia*, the following: (i) on November 20, 2012, Greebel provided Retrophin Employee 1 with a template share transfer agreement previously provided to Shkreli; (ii) on November 25, 2012, in response Shkreli's question about cancelling a transfer of Retrophin shares previously given by Shkreli, Greebel responded, "hard to unwind stuff - easier if they transfer back."; (iii) on November 29, 2012, Retrophin Employee 1 emailed Greebel and accountants an agreement, signed by Shkreli and Co-Conspirator 1, transferring 4,167 shares from Co-Conspirator 1 to Shkreli; (iv) also on November 29, 2012, within a half-hour later, Shkreli, Greebel, Co-Conspirator 1 and Retrophin Employee 1 exchanged emails, from which Greebel removed the accountants, wherein Shkreli stated, "that agreement was signed in June"; (v) a few minutes later, Retrophin Employee 1 emailed Shkreli and Greebel, copying Co-Conspirator 1, attaching the same transfer agreement, which had been changed so that the November 29, 2012 dates below the signature lines for Shkreli and Co-Conspirator 1 were covered by clearly-visible redacting tape and replaced with the date of July 1, 2012; (vi) one minute later, in response, Greebel emailed Retrophin Employee 1 and stated, "please call me"; (vii) amidst this email exchange, one of the accountants who had received the original share transfer agreement from Retrophin Employee 1, exclaimed, "WT .... F."; (viii) 30 minutes after Greebel asked Retrophin Employee 1 to call him, Retrophin Employee 1 emailed Shkreli and Greebel, copying Co-Conspirator 1, attaching the transfer agreement between Shkreli and Co-Conspirator 1 with a new signature page, without any visible redacting tape and a new date of June 1, 2012 typed in rather than being handwritten; (ix) on December 3, 2012, Retrophin

Employee 1 emailed the accountant, attaching Co-Conspirator 1's backdated agreement, as well as similar backdated share transfer agreements by Corrupt Employee 1 and Corrupt Employee 2 dated July 1, 2012, along with an agreement between Shkreli and MSMB dated July 1, 2012 transferring 75,000 shares from Shkreli to MSMB; and (x) although none of the MSMB capitalization tables prepared in July, September, and November 2012 reflected any of these agreements, later on December 3, 2012, Shkreli emailed Greebel and Retrophin Employee 1, attaching a "final capitalization table" containing an entry for MSMB for 75,000 shares.

(g)  ***Shkreli worked with his Kaye Scholer lawyer to hide settlements with defrauded MSMB and Elea Capital investors as sham consulting agreements with Retrophin***.  Between September 2013 and March 2014, Defendant Shkreli and Greebel, along with others, caused Retrophin to enter into four sham "consulting" agreements with defrauded investors of Elea Capital and MSMB that were, in actuality, settlement agreements.  Three of the four "consulting" agreements provided that the defrauded investors would provide consulting services "on strategic and corporate governance matters to the management of the company" and contained releases as to Shkreli, MSMB and Retrophin.  The fourth, entered into with the defrauded Elea Capital investor, provided that the investor would provide consulting services "on cluster headache drug development and other matters to the Company."  Retrophin received no legitimate consulting services based on these sham agreements.  Shkreli and Greebel tried to conceal the true nature of these sham consulting agreements, three of which were never presented to Retrophin's Board for approval.  The fourth was put on the Board's agenda, but never approved.  On April 19, 2013, Greebel emailed Shkreli attaching a form consulting agreement to use in settling claims and stated, "I think you should get blanket approval from the

board for you to retain consultants who may be paid in cash or stock up to an aggregate amount of $."

   This scheme, too, was well-documented, including an email exchange on October 16, 2013, in which: (i) Greebel emailed Shkreli informing him that a defrauded investor wanted 100,000 Retrophin shares as part of his settlement and did not want to enter into a consulting agreement; (ii) when Shkreli indicated that was acceptable, Greebel stated, "Where will the 100k come from? If it's from the company it would need to be in a consulting agreement."; (iii) Shkreli questioned Greebel's approach, stating, "Why would it need to be a consulting agreement???! Have you heard of the term settlement?"; and (iv) Greebel responded by explaining, "We can call it a settlement agreement, but given [the auditor's] recent behavior they may require it to be disclosed in the financials. I was trying to prevent that issue."

   87.   These facts, circumstances, and events revealed to investors for the first time on December 17, 2015 that, despite Defendant Shkreli's prior statements during the Class Period, he and his associates were utterly unfit to run KaloBios, the funding and financing he promised for KaloBios's future operations was completely non-viable, KaloBios's announced plans for strategic acquisitions, advancement of its drug programs, and regulatory approvals from FDA were unrealistic and non-viable, and KaloBios faced imminent bankruptcy.

   88.   On this news, KaloBios's stock plummeted 53% in pre-open trading before NASDAQ halted all trading (when trading volume had only reached 13,700 shares) so that NASDAQ could request more information from KaloBios.   Even the exchange itself was blindsided.   NASDAQ put out a statement at 10:41 a.m. on December 17, 2015, stating that it had halted trading at 6:48 a.m. and that trading would remain halted "until KaloBios

Pharmaceuticals, Inc. has fully satisfied NASDAQ's request for additional information" as to the circumstances surrounding Shkreli's arrest.

89.     With trading still halted, the bad news for KaloBios investors piled up.

90.     On December 21, 2015, KaloBios's independent accounting firm, Marcum LLP, which had only been hired less than two weeks earlier, resigned.

91.     On December 24, 2015, NASDAQ announced that KaloBios's stock would be delisted on December 30, 2015 due to Shkreli's arrests and other issues.

92.     KaloBios filed for bankruptcy on December 29, 2015, and withdrew its appeal of its NASDAQ delisting on January 12, 2016.

93.     When KaloBios finally resumed trading, on the over the counter (OTC) market, on January 13, 2016, it opened at $2.51, reached an intra-day low of $1.02, and finally closed at $4.39.

94.     As a result of Defendant Shkreli's materially false and misleading statements and omissions, KaloBios securities traded at inflated prices during the Class Period.  However, after Defendant Shkreli's fraud was revealed, KaloBios's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and other Class members.

**Relevant Post-Class Period Facts**

95.     Shkreli stood trial during the summer of 2017.  During the trial, as quoted in *The Wall Street Journal*, Shkreli's own lawyer admitted, "Martin is Martin.  You're going to find out that every time he said something to an investor, on a certain date, not everything he said was 100% accurate."  Prosecutors revealed at a hearing that Shkreli's lawyers had offered to have him plead guilty at least three times, including a week before the June 26, 2017 start of his trial.

66

96.     Ultimately, Shkkreli was found guilty of securities fraud in connection with MSMB Capital, Securities fraud in connection with MSMB Healthcare, and conspiracy to commit securities fraud in connection with Retrophin.  He faces up to 20 years in prison when he is sentences during the fall of 2017.

97.     Greebel awaits his criminal trial for his role in the frauds at MSMB and Retrophin.  Greebel's trial was severed from Shkreli's trial and is scheduled to proceed in the fall of 2017.

## CLASS ACTION ALLEGATIONS

98.     As against Defendant Shkreli, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class of persons or entities who purchased or otherwise acquired the common stock of KaloBios during the Class Period extending from November 19, 2015 and December 16, 2015, both dates inclusive, seeking to recover damages caused by Defendant Shkreli's violations of the federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder.  Excluded from the Class are the Settling Defendants and Defendant Shkreli, their immediate family members, and KaloBios's officers, directors, executive employees, subsidiaries and affiliates.[3]

99.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, KaloBios' securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and

---

[3]   As noted in ¶3 *supra*, the facts and circumstances alleged herein also give rise to claims against Settling Defendants Martell, Cross, and KaloBios on behalf of investors who purchased or otherwise acquired the common stock of KaloBios between November 18, 2015 and December 16, 2015, inclusive, for violations of Exchange Act §§10(b) and 20(a), claims which are, at present, subject to the "Partial Settlement" and, pursuant to its terms, a stay of this action as against the Settling Defendants pending its final approval by the Court.

can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of KaloBios shares were traded publicly during the Class Period on the NASDAQ. As of August 7, 2015, KaloBios had 4,123,921 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by KaloBios or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, as was done in the administration of the Partial Settlement with the Settling Defendants in this action.

100.    Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendant Shkreli's wrongful conduct in violation of federal law that is complained of herein.

101.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.  Indeed, the Court has already held as much, in granting both preliminary and final approval to the Partial Settlement with the Settling Defendants.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendant Shkreli's acts as alleged herein;

- whether statements made by Defendant Shkreli to the investing public during the Class Period, as alleged herein, misrepresented and/or omitted material facts about the business, operations, management, and prospects of KaloBios and/or the facts and circumstances surrounding Defendant Shkreli's experiences at other companies including Retrophin and MSMB;

- whether Defendant Shkreli acted knowingly or recklessly in issuing false and misleading public statements as alleged herein;

- whether the prices of KaloBios securities during the Class Period were artificially inflated because of Defendant Shkreli's conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FRAUD ON THE MARKET PRESUMPTION

104.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, *inter alia*:

- Defendant Shkreli made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- KaloBios securities traded in an efficient market at all relevant times;

- KaloBios's shares were liquid and traded with moderate to heavy volume at all relevant times;

- KaloBios's shares traded on the NASDAQ during the Class Period and was covered by multiple analysts at all relevant times;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of KaloBios's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold KaloBios securities between the time Defendant Shkreli failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

105.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

106.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendant Shkreli omitted substantial material information in his Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

107.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded herein, which were not properly identified as forward-looking statements when made.

108.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

109.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendant Shkreli is nonetheless liable for making such statements because, at the time each statement was made, he knew the statement was materially false and/or misleading.

## SCIENTER

110.    To the extent it is required to be plead for certain of the claims alleged herein, Defendant Shkreli scienter is readily apparent.

111.    It is also clear that, at all relevant times, Defendant Shkreli acted knowingly.  In making the totality of his misstatements alleged herein, he had full knowledge of the facts and

circumstances concerning the insufficiency of his own personal resources to deliver the promised funding to KaloBios; his own fraudulent and criminal misconduct at his prior companies, including Retrophin and MSMB; the involvement of Biestek, Fernandez, Harrison, and Crutcher in his frauds at Retrophin and MSMB, and his fraud concerning the $8.2 million private placement transaction with Kaye Scholer listed as "Company Counsel" to deceive investors.  He knew all of the details set forth in the SEC complaint and the criminal indictments made public after the Class Period, and in the evidence later presented against him at his criminal trial, which resulted in his conviction.

112.    Moreover, each of Defendant Shkreli's misstatements alleged herein were made by him as CEO and Chairman of KaloBios.  In those roles, he had a legal duty to monitor information indicating that his statements were false, such that his failure to do so could only have been through his recklessness.  Moreover, the information rendering his statements false and misleading is imputable to him, due to his titles, roles, and responsibilities at KaloBios.

113.    Defendant Shkreli also had substantial motive to commit the fraud alleged herein, so as to secure massive profits by running up the price of KaloBios stock.  He gained control of KaloBios through open-market purchases of its stock at prices as low as $0.30.  Through the fraud alleged herein, he drove its stock price as high as $45.82 during the Class Period.  At that price, the Shkreli Group's 70% stake in KaloBios was worth over $132 million.

114.    Defendant Shkreli's lack of stock sales during the short, one-month Class Period cannot credibly be pointed to as an exonerating fact as to his scienter, as during the 11/25/2015 Bloomberg interview, he ***admitted*** that he could not sell his shares for six months or he would have to disgorge the profits to the company, stating: "[Y]ou have to keep in mind that there's Section 16B of the SEC Act, which states that you cannot sell a stock within 6 months after

acquiring more than 10 percent stake without disgorging the profits to the company.  So, I don't plan on disgorging the profits to the company."  This quote illustrates that he *investigated* the possibility of selling at a profit, and made a calculated decision to wait for 6 months so as to ensure retention of the profits for himself.  Thus, Defendant Shkreli was motivated to drive up the price of KaloBios, through the false and misleading statements alleged herein, long enough to cash in at inflated prices once permitted to retain the proceeds from his pump-and-dump scheme.

115.   Defendant Shkreli was also under a clear duty to speak truthfully and, having chosen to speak, was obligated to speak the whole truth.  As discussed *supra*, Defendant Shkreli made and/or caused to be made the alleged false and misleading statements and omissions alleged herein and signed the SEC filings within which such misstatements and omissions appeared.  As discussed herein, Defendant Shkreli violated such duties.

116.   Moreover, the fraud alleged herein implicates the core operations of KaloBios.  Its ability to stabilize its leadership, secure necessary funding and financing, and identify a viable path forward in the wake of several operational failures were existential issues for KaloBios, as it was on the brink of bankruptcy and liquidation heading into the Class Period.  Without the funding promised by Shkreli, which he lacked the resources to deliver, lenzilumab stood no chance of making its way through clinical trials and FDA approval to market.  In light of these facts, it is inconceivable that Defendant Shkreli did not know the facts and circumstances of the fraud as alleged herein.

## LOSS CAUSATION / ECONOMIC LOSS

117.   The market for KaloBios shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendant Shkreli engaged in a course of conduct and a scheme to deceive the market that artificially inflated KaloBios shares

and operated as a fraud or deceit on Class Period purchasers of KaloBios shares by misrepresenting the material facts detailed herein. As detailed above, when Defendant Shkreli's prior misrepresentations became known to the public, the price of KaloBios shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of KaloBios shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

118. During the Class Period, Defendant Shkreli presented a false and misleading picture of his own ability to deliver necessary and promised funds to KaloBios so as to stave off its bankruptcy and advance lenzilumab through clinical trials to FDA approval; the comfort that investors should take from KaloBios's retention of Kaye Scholer as its "Company Counsel" in the PIPES transaction and from Shkreli's appointment of Biestek, Fernandez, Harrison, and Crutcher to leadership positions at KaloBios; the purported lack of a pending investigation by the SEC against these individuals or Shkreli; and the purported "credibility and trustworthiness" and purportedly positive attributes, skill, and experience that Shkreli brought from his leadership of MSMB and Retrophin as he took over control of KaloBios; as well as KaloBios's financial condition, operations, and business prospects. Defendant Shkreli's false and misleading statements had the intended effect, driving up the value of the Shkreli Group's 70% stake in KaloBios by causing its shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

119. In response to the corrective events on December 17, 20015, the price of KaloBios shares dropped so sharply that NASDAQ halted trading before the markets even opened. Once trading in KaloBios stock resumed, its price immediately cratered, removing

inflation due to the alleged fraud, causing real economic loss to investors who had purchased KaloBios shares during the Class Period.

120.    The decline was a direct result of the nature and extent of Defendant Shkreli's fraud being revealed to investors and the market.  The timing and magnitude of the price decline in KaloBios shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or company-specific facts unrelated to Defendant Shkreli's fraudulent conduct.

121.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendant Shkreli's fraudulent scheme to artificially inflate KaloBios's share price and the subsequent significant decline in the value of KaloBios shares when his prior misrepresentations and other fraudulent conduct were revealed.

## COUNT I
### For Violations Of
### Exchange Act Section 10(b) And Rule 10b-5 Promulgated Thereunder

122.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.    This Count is asserted against Defendant Shkreli and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

124.    During the Class Period, Defendant Shkreli and the Settling Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of KaloBios securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire KaloBios securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendant Shkreli and the Settling Defendants, and each of them, took the actions set forth herein.

125.    Pursuant to the above plan, scheme, conspiracy and course of conduct, Defendant Shkreli and the Settling Defendants participated directly or indirectly in the preparation and/or issuance of the press releases, SEC filings, and other public statements as described above, including statements made to securities analysts and the media that were designed to influence the market for KaloBios securities.  Such releases, filings, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth, *inter alia*, about Shkreli's ability to deliver necessary and promised funds to KaloBios, without which it could not advance lenzilumab through clinical trials and FDA approval to the marketplace and could not stave off bankruptcy; about the comfort that investors should take from KaloBios's retention of Kaye Scholer as its "Company Counsel" in the PIPES transaction and from Shkreli's appointment of Biestek, Fernandez, Harrison, and Crutcher to leadership positions at KaloBios; about the purported lack of a pending investigation by the SEC against these individuals or Shkreli; and about the purported "credibility and trustworthiness" and purportedly positive attributes, skill, and experience that Shkreli brought from his leadership of

MSMB and Retrophin as he took over control of KaloBios; as well as about KaloBios's financial condition, operations, and business prospects.

126.    Information showing that Defendant Shkreli and the Settling Defendants acted knowingly or with reckless disregard for the truth was peculiarly within their knowledge and control.

127.    In the case of Defendant Shkreli and Settling Defendant KaloBios, their actual knowledge of the materially false and misleading statements and material omissions made throughout the Class Period, by which they intended to deceive and did deceive Plaintiffs and the other members of the Class, cannot reasonably be disputed as Shkreli had full knowledge of the facts and circumstances concerning, *inter alia*, his own financial resources and inability to deliver the necessary and promised funds to KaloBios; concerning the criminal frauds Shkreli perpetrated at MSMB and Retrophin, and the participation in those frauds by Biestek, Fernandez, Harrison, Crutcher, and Kaye Scholer attorney Greebel; concerning the fraud employed in closing the $8.2 million PIPES transaction. Such knowledge would in any event be imputable to Defendant Shkreli due to his positions and oversight roles at KaloBios and the implication of the core operations of KaloBios. As its controlling shareholder, CEO, and Chairman, Defendant Shkreli's knowledge is imputable to Settling Defendant KaloBios.

128.    In the alternative, Defendant Shkreli and Settling Defendant KaloBios acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Defendants Shkreli and Settling Defendant KaloBios were committed willfully or with reckless disregard for the truth. In

addition, they knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

129.     As discussed herein, Defendant Shkreli was personally motivated to commit the alleged fraud so as to reap massive profits in a pump-and-dump scheme from driving up KaloBios's stock price orders of magnitude higher than the prices he paid on the open market to secure a controlling stake in KaloBios and maintaining its price inflated levels until such time as he could liquidate some or all of his position in KaloBios 6 months later.  Settling Defendant KaloBios was motivated by the prospects of avoiding bankruptcy, securing the $8.2 million private placement, and completing strategic transactions that might stave off its demise.

130.     Defendant Shkreli is liable both directly and indirectly for the wrongs complained of herein.  Because of his positions of control and authority, he was able to and did, directly or indirectly, control the content of the statements of KaloBios as alleged herein.  As an officer and/or director of a publicly-held company, he had a duty to disseminate timely, accurate, and truthful information with respect to KaloBios's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the false misleading public statements as alleged herein, the market price of KaloBios securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning KaloBios's business and financial condition which were concealed by Defendant Shkreli and Settling Defendant KaloBios, Plaintiffs and the other members of the Class purchased or otherwise acquired KaloBios securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendant Shkreli and Settling Defendant KaloBios, and were damaged thereby.

131.   During the Class Period, KaloBios securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendant Shkreli made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of KaloBios securities at prices artificially inflated by his wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of KaloBios securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.   The market price of KaloBios securities declined precipitously upon public disclosure revealed the truth as alleged herein, to the injury of Plaintiffs and Class members.

132.   By reason of the conduct alleged herein, Defendant Shkreli and Settling Defendant KaloBios knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133.   As a direct and proximate result of Defendant Shkreli's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of KaloBios's securities during the Class Period, upon the corrective events outlined herein that revealed that Defendant Shkreli and Settling Defendant KaloBios had been disseminating material misrepresentations and omissions to the investing public.

## COUNT II
## Violations Of Section 20(a) Of The Exchange Act

134.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135.    During the Class Period, Defendant Shkreli participated in and controlled the operation and management of KaloBios, and conducted, participated in, and controlled, directly and indirectly, the conduct of KaloBios's business affairs.   Due, *inter alia*, to his complete control over KaloBios, stemming from the Shkreli Group's 70% stake in KaloBios and his majority ownership of that stake, as well as his positions as CEO and Chairman and related oversight roles, he knew the adverse non-public information about KaloBios's leadership, business and operations, internal controls, and finances, and future prospects, including without limitation its dependence upon funds that Shkreli promised to KaloBios but could not deliver and the material information alleged to have been omitted in public statements as discussed herein.

136.    As an officer and/or director of a public company, Defendant Shkreli had a duty to disseminate accurate and truthful information with respect to, *inter alia*, his own ability to deliver the funds he promised to KaloBios, which were necessary to stave off its bankruptcy and to advance lenzilumab through clinical trials and FDA approval to the marketplace; his own criminal frauds  at MSMB and Retrophin, and the participation in those frauds by Biestek, Fernandez, Harrison, Crutcher, and Greebel; the existence of the investigations pending against him; the fraud employed in closing the $8.2 million PIPES transaction; as well as KaloBios's leadership, business, operations, finances, financial condition and future prospects, and to correct promptly any public statements issued by himself and Settling Defendant KaloBios that had become materially false or misleading.

137.    Because of his position of control and authority as controlling shareholder, CEO, and Chairman, Defendant Shkreli was able to, and did, control the contents of the press releases, SEC filings and other public statements which KaloBios disseminated in the marketplace during the Class Period, as alleged herein.  Throughout the Class Period, he exercised his power and authority to cause KaloBios to engage in the wrongful acts complained of herein. Defendant Shkreli therefore, was a "controlling person" of KaloBios within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of KaloBios securities.

138.    Defendant Shkreli, therefore, acted as a controlling person of KaloBios.  By reason of his controlling interest in KaloBios, and his positions as CEO and Chairman, he had the power to direct the actions of, and exercised the same to cause, KaloBios to engage in the unlawful acts and conduct complained of herein.  Defendant Shkreli exercised control over the general operations of KaloBios and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

139.    By reason of the above conduct, Defendant Shkreli is liable pursuant to Section 20(a) of the Exchange Act, 15 §78t(a), for the violations committed by Settling Defendant KaloBios.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating the KaloBios Investor Group as Lead

Plaintiffs, and certifying the KaloBios Investor Group and Plaintiff Isensee as a Class representatives and their choice of counsel as Lead Counsel;

B.      Imposing joint and several liability on Defendant Shkreli, requiring him to pay the damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein, in an amount to be proven at trial;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: August 25, 2017              Respectfully submitted,


                                    /s/Matthew L. Tuccillo

                                    Jennifer Pafiti (SBN 282790)
                                    **POMERANTZ LLP**
                                    468 North Camden Drive
                                    Beverly Hills, CA 90210
                                    Telephone:      (818) 532-6449
                                    E-mail:         jpafiti@pomlaw.com

                                    Marc I. Gross
                                    Jeremy A. Lieberman
                                    Matthew L. Tuccillo
                                    J. Alexander Hood II
                                    **POMERANTZ LLP**
                                    600 Third Avenue, 20th Floor
                                    New York, New York 10016
                                    Telephone:      (212) 661-1100
                                    Facsimile:      (212) 661-8665
                                    Email: migross@pomlaw.com
                                            jalieberman@pomlaw.com
                                            mltuccillo@pomlaw.com
                                            ahood@pomlaw.com

1

2   Patrick V. Dahlstrom
    **POMERANTZ LLP**
3   10 South La Salle Street, Suite 3505
    Chicago, Illinois 60603
4   Telephone:     (312) 377-1181
    Facsimile:     (312) 377-1184
5   Email:  pdahlstrom@pomlaw.com

6

7   *Attorneys for Lead Plaintiffs and Plaintiff Isensee*
    *and Proposed Lead Counsel*

8
    Lionel Z. Glancy
9   Robert V. Prongay
    Ex Kano S. Sams II
10  **GLANCY PRONGAY & MURRAY LLP**

11  1925 Century Park East
    Suite 2100
12  Los Angeles, CA 90067
    Telephone:  (310) 201-9150
13  Facsimile:  (310) 201-9160
    Email: lglancy@glancylaw.com
14          rprongay@glancylaw.com
15          esams@glancylaw.com

16  *Additional attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On August 25, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 25, 2017, at New York, New York.


*s/ Matthew L. Tuccillo*
Matthew L. Tuccillo

# Mailing Information for a Case 5:15-cv-05841-EJD In Re: KALOBIOS PHARMACEUTICALS, INC. SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com

- **Peter C Buckley**
  pbuckley@foxrothschild.com

- **Keith I. Chrestionson**
  kchrestionson@foxrothschild.com,enadolny@foxrothschild.com

- **Jennifer Ann Ebling**
  jebling@fenwick.com,rchang@fenwick.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Robert S. Green**
  gnecf@classcounsel.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Stacy R. Hovan**
  stacy.hovan@hoganlovells.com,sheana-chandar-5382@ecf.pacerpro.com,stacy-hovan-1835@ecf.pacerpro.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,recordsecf@fenwick.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Lesley F Portnoy**
  lportnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Michael J. Shepard**
  michael.shepard@hoganlovells.com,dena-voecks-
  5065@ecf.pacerpro.com,michael.ewers@hoganlovells.com,michael-shepard-
  5680@ecf.pacerpro.com,Dena.Voecks@hoganlovells.com,ky-yen.wong@hoganlovells.com,ky-
  yen-wong-hogan-lovells-us-6287@ecf.pacerpro.com

- **William Stassen**
  wstassen@foxrothschild.com

- **Matthew Laurence Tuccillo**
  mltuccillo@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Scott L Vernick**
  svernick@foxrothschild.com

- **Avraham Noam Wagner**
  avi@thewagnerfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)